UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN MORAN,                              CIVIL NO. 05-11091-RCL
NORA MORAN,                              CIVIL NO. 05-11092-RCL

      Plaintiffs,

      v.

UNITED STATES OF AMERICA,

      Defendant.

_____/

## GOVERNMENT'S RESPONSE TO PLAINTIFFS' MOTIONS TO VACATE, SET ASIDE OR CORRECT SENTENCES PURSUANT TO TITLE 28, UNITED STATES CODE, SECTION 2255

The government hereby responds to the plaintiffs' motions to vacate, set aside or correct their sentences pursuant to 28 U.S.C. 2255. The government opposes the motions, which are not valid, and they should be dismissed with prejudice.

The only claim raised by the plaintiffs, who were criminal defendants in the case of United States v. John Moran & Nora Moran, Crim. No. 96-10335-RCL (D. Mass.), is that they received ineffective assistance of counsel because of their attorneys' failure to file timely motions for a new trial under Fed.R.Crim.P. 33. They state that, had the motions been timely filed, this court would have granted the motions and awarded them new trials. The facts, however, do not establish that

the Morans' attorneys' assistance fell below an objective standard of reasonableness, or that the Morans suffered actual prejudice.

Furthermore, the Morans' quest for new trials ultimately would have failed on appeal even if a new trial was ordered by this court. Whether denied by this court, or on appeal, under Rule 33 the Morans were not entitled to a new trial. Therefore, the Morans' challenges to their convictions under Section 2255 must fail. There is no need for a hearing in this matter.

I.    **FACTS**

   A.    **Posture of the Cases**

In the criminal case, the jury returned guilty verdicts on Counts 1, 2, and 3 against both defendants, charging conspiracy and bank fraud (18 U.S.C. 371, 1344). Both defendants filed a timely post-trial motion for judgment of acquittal under Fed.R.Crim. P. 29. Nora Moran later filed an untimely post-trial motion for a new trial under Fed.R.Crim.P. 33. This court granted the motion for judgment of acquittal and overturned the jury verdicts.

The government filed an appeal to United States Court of Appeals for the First Circuit, which reversed and remanded, finding that the evidence was sufficient and reinstating the jury's guilty verdicts. United States v. Moran, 312 F.2d 480 (1st Cir. 2002)("Moran I")(attached as Exhibit 1). Upon remand, this

2

court  ruled that Nora Moran's new trial motion was untimely. The court sentenced the Morans to terms of probation. The Morans filed appeals to the First Circuit, which affirmed their convictions. United States v. Moran, 393 F.3d 1 (1st Cir. 2004)("Moran II")(attached as Exhibit 2). The Morans then filed these actions under 28 U.S.C. 2255, alleging that they received ineffective assistance of counsel.

B.    **The Evidence**

Because of the First Circuit's prior opinions in this matter, the government will not recite the facts in detail. The following facts are pertinent to this proceeding.

Two First American Bank for Savings ("FA") construction loans are involved in this case. They initially totaled $17 million (later about $22 million), for Boston properties in which John Moran and Nora Moran held undisclosed financial interests, and for which John Moran paid himself $255,000 in undisclosed loan broker's fees from FA's funds. John Moran was the bank's closing attorney on the loans; the bank paid him for those service. John Moran did not disclose his conflicts of interest to the bank.

At FA, the Executive Committee ("executive committee") was the primary body which reviewed and approved loans. It met periodically to consider loans and it could approve, disapprove, modify, or table proposed loans. Loans approved by

3

the committee would be presented to FA's Board of Directors ("board of directors") at its next meeting for further review, approval or ratification [8:43, 47-49].[1]

At monthly board of directors' meetings, the bank treasurer gave directors copies of a report regarding the executive committee's activities for the previous month; the treasurer would also read a summary of the full report [8:43, 13:31-32, 102-05, EX 43, 64]. After the summary report was read, the directors would vote to accept the summary report and waive reading of the full report [Id.]. The directors would then vote to approve or ratify the loans which had been approved by the executive committee. The board had the power to approve a loan as presented, veto it, decide which terms and conditions were acceptable, table a loan, delay a loan, or ask for more information [8:47].

Regulation "O" of the Federal Reserve Board (12 C.F.R. 215), as it applied to FA, required the prior approval by a majority of the entire board of directors for all loans to bank directors and executive officers which, when combined with the officer's or director's other loans from FA, exceeded $500,000 [8:35-37, 40-42].

---

[1]     Citations to the trial transcripts are cited by the day involved and the page, such as 8:13, for the eighth day of trial at page 13. The government's trial exhibits are cited with the prefix "GX."  Items from the docket sheet are cited by the prefix "D."

Any interested director would have to disclose fully her financial interests, and could not participate directly or indirectly in discussion or voting on the loan by the directors. [2:33-35]. Loans to bank insiders could be made only on substantially the same terms, including interest rates and collateral, as for other non-insider borrowers. And insider loans could not involve more than the normal risk of default. The bank was required to keep records of insider loans to directors, executive officers and their related interests. Failure to comply with Regulation "O" could subject FA and its directors to disciplinary action by the Federal Deposit Insurance Corporation ("FDIC") [8:36-37].

The bank's executive committee met December 17, 1986, to consider loans, including two loans to Edgard Puente and David Boersner, Boston real-estate developers who had formed a partnership with John Moran [20:36-39, GX 30]. The executive committee approved the Puente and Boersner loans, plus 11 other commercial loans [20:36, 40-41, GX 30]. The loans closed in December 1986. At the time, Nora Moran was a FA director, and when the loans closed she knew of the brokerage fees John Moran would pay himself, as well as the ownership interests in the projects [3:42, 7:17, 29, GX 6]. But she did not disclose these conflicts of interest, and did not abstain from participating in the board's review and approval of the loans.

FA's general counsel Michael Hanson testified that Nora Moran's failure to make a full, complete disclosure of the financial interests of John Moran and herself caused the bank to violate Regulation "O." This exposed the bank and its personnel to a possible civil action by the bank's shareholders or actions by the FDIC [8:36-37, 39, 13:86-87, 93-94].

According to Hanson, the information hidden from FA about the Morans' interests in the loans was highly material and would have triggered the following steps: [A] Nora Moran would have been disqualified from any involvement in the loans, [B] the loans would not have been reviewed by the executive committee; instead, the board of directors would have conducted the initial review of the loans, as required by Regulation "O" and the bank's Code of Professional Ethics [GX-20, 21], [C] the bank would have been forced to review the loans under Regulation "O" to insure that they were not being made on preferential terms and did not involve any greater risk than similar loans, [D] even if the loans were made, the review process would have been lengthy because of the need to document fully the loan for the FDIC and state bank examiners, who would examine them in detail later, [E] FA would have had the opportunity to get independent legal counsel and remove John Moran as its closing attorney, and [F] FA could have charged different interest rates and/or required more collateral and security on the loans

(including requiring that both of the Morans sign promissory notes for the loans) [9:47-49, 55-57].

C.    **The Post-trial Proceedings**

On July 14, 1999, the jury returned guilty verdicts on Counts 1, 2, and 3 of the Superseding Indictment [D-234, D-235]. On July 15, 1999, the Morans filed a joint motion for judgment of acquittal under Fed.R.Crim.P. 29 [D-238]; the motion renewed prior Rule 29 motions made during trial. The motion also requested an extension of time to file briefs supporting the Morans' Rule 29 motion. The Morans did not seek an extension of time to file any further motions.

On August 2, 1999, the Court granted the Morans an extension of time until September 15, 1999, to file briefs in support of their Rule 29 motion [D-238].  On September 15, 1999, Nora Moran filed a "Supplemental Memorandum in Support of Defendant Nora Moran's Motion for Judgment of Acquittal and/or Motion for a new Trial" [D-239]. The memorandum asked that the prior Rule 29 motion, which was timely, be converted into a motion for a new trial under Fed.R.Crim.P.  33. In it, Nora Moran claimed that the verdicts were against the weight of the evidence. On the same day, John Moran filed a "Memorandum of John M. Moran in Support of his Renewed Motion for Judgment of Acquittal," [D-240]. At the end of his 21-page brief, John Moran asked that the court treat his earlier Rule 29 motion as a motion for a new trial and grant him a new trial.

7

On October 1, 1999, Nora Moran filed a motion for a new trial under Rule 33, claiming jury misconduct during the deliberations. [D-241]. On December 27, 1999, the court denied the motion [D-253]. On July 13, 2000, the court granted the Morans' Rule 29 motions and dismissed the charges.

D.     **The First Circuit's Moran I Opinion**

In Moran I, 312 F.3d 480, the panel (Chief Judge Boudin, Judge Selya and Judge Greenberg (3d Cir.)), issued an opinion which held, inter alia, the following:

1.     There was sufficient evidence that John Moran was guilty of bank fraud (18 U.S.C. 1344), 312 F.3d at 489 ("a jury well could have found beyond a reasonable doubt that John Moran knowingly executed a scheme to defraud First American");

2.     There was sufficient evidence that Nora Moran was guilty of bank fraud:

   A.     "there was significant evidence tending to establish Nora Moran's knowing, active participation in the fraudulent scheme," 312 F.3d at 492;

   B.     "the evidence supported a conclusion that Nora Moran knowingly executed the scheme to defraud First American through her deceptive acts (for example, signing the trust documents for the entity holding the 20% profit interest) and omissions (deliberately concealing information that might have delayed or terminated the loan review process) and therefore was a sufficient basis on which the jury could convict her of bank fraud," 312 F.3d at 493 (parenthetical in original);

3.     There was sufficient evidence that Nora Moran was guilty of aiding and abetting (18 U.S.C. 2) John Moran in his bank fraud scheme to defraud FA, 312 F.3d at 493-94 ("these facts make out the essential elements of aiding and abetting liability for bank fraud . . . even if

8

Nora Moran did not execute or attempt to execute the scheme, there was sufficient evidence to conclude beyond a reasonable doubt that she willfully aided and abetted John Moran's fraud by associating herself with his venture and seeking by her actions to make it succeed")(footnote omitted);

4. There was sufficient evidence that John Moran and Nora Moran were guilty of conspiracy (18 U.S.C. 371), 312 F.3d at 494 ("the government offered sufficient evidence to convict both Morans of the conspiracy to commit bank fraud");

5. The Morans' scheme to defraud FA, and its misrepresentations, were material for purposes of the bank fraud statute, 312 F.3d at 491 & n. 13;

6. Nora Moran was aware of John Moran's brokerage and profit arrangement by the time the loans were approved, although she never volunteered that information to anyone at FA, 312 F.3d at 484, 492;

7. Nora Moran "knew of her husband's stake in the outcome of the loans[,] and understood that federal banking regulations, First American's Code of Professional Ethics, and her common-law fiduciary status as a bank director required her to make the appropriate disclosures[,] [n]evertheless she chose not to divulge the information to maintain the false impression that the loans were not tainted or suspect in any significant way," 312 F.2d at 493 (footnote omitted, parenthetical added);

8. Although it "was not clear" whether Nora Moran participated in a vote on the loans at the board of directors meeting January 17, 1987, (312 F.3d at 492), she was still guilty of bank fraud for her own actions, she was guilty of bank fraud for aiding and abetting John Moran's bank fraud, and she was guilty of conspiracy to commit bank fraud, 312 F.3d at 492-94;

9. "[T]he government's theory of Nora Moran's liability for bank fraud was not limited exclusively to her active participation in the January vote[,] . . . [and] the indictment charged that in spite of her fiduciary position and independently of any Board votes or meetings, she chose

9

not to disclose her husband's brokerage or profit arrangement and in fact executed the MDG Trust document in order to facilitate the fraudulent scheme. Furthermore, the government pursued its non-disclosure theory of liability at trial and during its closing arguments," 312 F.3d at 492 n.14 (parenthetical added).

E.    **Further Proceedings in This Court**

On March 14, 2003, after the <u>Moran I</u> opinion and upon remand, the Court denied Nora Moran's new trial motion [D-329]. The Court found that it lacked jurisdiction to consider the motion. The Court then proceeded to sentence the Morans to terms of probation, and the Morans appealed to the First Circuit.

F.    **The First Circuit's Moran II Opinion**

In <u>Moran II</u>, 393 F.3d 1, the panel (Judges Selya, Stahl, and Lynch), issued an opinion which held, <u>inter alia</u>, the following:

1.    The court summarized the facts as set out in <u>Moran I</u>, 391 F.3d at 4-7;

2.    There was no "manifest injustice" in <u>Moran I</u>'s holding that there was sufficient evidence to support Nora Moran's convictions for conspiracy and bank fraud, and there was nothing "unreasonable or obviously wrong" with that conclusion, 393 F.3d at 8;

3.    The timely Rule 29 motion for judgment of acquittal could not be converted into a Rule 33 new trial motion, 393 F.3d at 8010;

4.    The court did not rule upon the allegation that the Morans' attorneys provided ineffective assistance of counsel, 393 F.3d at 10-12;

5.    There was no plain error in the jury instructions, 393 F.3d at 12-14;

6.    There was no plain error in the government's closing arguments, 393 F.3d at 13-16.

## II. **ARGUMENT**

### A.    **The Morans' Unrealistic View of Their Case**

The Morans approach their criminal case, and their Section 2255 petitions, with three major misconceptions which distort their views of the matters. First, they steadfastly claim that they were the victims of unjust, unsupported, and incorrect convictions where the evidence was insufficient. This leads them to make broadside claims that there was a "miscarriage of justice" and that the evidence "preponderates so heavily against the jury verdicts" that they should be granted new trials. "Memorandum of Law in Support of Motions of John M. Moran and Nora Moran to Vacate Sentences Pursuant to 28 U.S.C. 2255" at 29, 32 ("Moran Memorandum").[2] But this perspective ignores reality. The Morans' cases, and the evidence supporting their convictions, have been reviewed by five judges sitting on the First Circuit, including:

A.    Honorable Michael Boudin, Moran I;

B.    Honorable Morton Greenberg (3rd Cir.), Moran I;

C.    Honorable Sandra Lynch, Moran II;

D.    Honorable Bruce Selya, Moran I and Moran II;

---

[2]    The Morans filed the same legal memorandum in both civil cases in support of their Section 2255 petitions. The government will refer to this as the Moran Memorandum.

E.     Honorable Norman Stahl, <u>Moran II</u>.

The reviewing judges found that the evidence supporting John Moran's

convictions for conspiracy and bank fraud was "ample" and "sufficient." <u>Moran II</u>,

393 F.3d at 6; <u>Moran I</u>, 312 F.3d at 493-94. The judges also found for Nora Moran

that there was "sufficient" evidence supporting her convictions for conspiracy and

bank fraud. <u>Moran I</u>, 312 F.3d at 493-94. For Nora Moran's bank fraud

convictions, the judges held that the  evidence was "sufficient" under two

independent, alternative theories: [A] for her personal involvement in a scheme to

defraud FA, and [B] because she aided and abetted John Moran in executing the

scheme to defraud.  <u>Id</u>. In light of these findings, it is much too late in the day to

claim that the convictions were unjust or a miscarriage of justice. Evidence which

is described as "ample" or "sufficient" is vastly different from evidence described

as a miscarriage of justice. <u>See generally</u> "Webster's Ninth New Collegiate

Dictionary" at 81, 1179  (1991)( Ample is defined as "generous or more than

adequate in size, scope, or capacity." Sufficient is defined as "enough to meet the

needs of a situation or a proposed end.").

Second, in viewing the facts of the case, the Morans ignore the First

Circuit's findings. They also ignore that, at this stage in the proceedings, the facts

must be viewed in a light most favorable to the government's verdict.  In this

regard, the Morans' extensive reliance upon this court's "Memorandum Opinion and Order on Defendants' Motion for Judgment of Acquittal," (July 13, 2000), is misplaced. See Moran Memorandum at 2-10, 28, 30, 33 (citing to the Court's July 13, 2000, opinion). Because the criminal case was tried before a jury, it was the jury and not the Court which was the finder of facts; thus unlike a bench trial, there are no findings of fact as set out by this court in its opinion. And because the First Circuit reversed this court's judgment of acquittal, its memorandum opinion is a nullity. Just as in the situation where a district court's judgment is vacated by an appellate court:

> [the opinion is] officially gone. [It] has no legal effect whatever. [It is] void. None of the statements made in [it] has any remaining force and cannot be considered to express the view of this Court.

United States v. Sigma International, Inc., 300 F.3d 1278, 1280 (11th Cir. 2002)(parenthetical added); see  O'Connor v. Donaldson, 422 U.S. 563, 577-578, n. 12 (1975)("[the] decision vacating the judgment of the [district] [c]ourt . . . deprives that court's opinion of precedential effect, leaving this court's [here, the First Circuit] opinion and judgment as the sole law of the case") (parenthetical added).

Finally, the Morans rely upon the comments of Judge Boudin's concurring opinion in Moran I, 312 F.3d at 494-96, as the definitive word from the First Circuit on various matters.  Moran Memorandum at 14-15, 40-42.  But those views

13

were not shared by the other judges in <u>Moran I</u>.  As Judge Selya wrote in <u>Moran II</u>,

393 F.3d at 8, what the Morans "seemingly fail[] to appreciate is that even the

author of that concurrence concluded that there was sufficient evidence upon

which to ground a conviction [for Nora Moran]." (parenthetical added).

B.    **The Claim of Ineffective Assistance**

The only claim raised by the Morans alleges that their attorneys were

incompetent for failing to file timely motions for new trial after the jury's verdicts.

The Morans allege that, because in their view the Court would have granted the

motions if timely filed, they are entitled to relief.  However, the long and thorough

record in this case clearly establishes that neither counsels' actions fell below an

objective standard of reasonableness.  The two principal trial attorneys who

represented the Morans (Francis Dimento and Kenneth Fishman) are among the

most distinguished, experienced, and capable attorneys who have practiced

criminal law before this court. Fishman is now an Associate Justice on the Superior

Court of the Commonwealth. For the Morans belatedly to claim that these

attorneys' dogged, disciplined, and dedicated representation of them was

unconstitutionally deficient is scandalous. It is also not credible.

Furthermore, the motions for a new trial were substantively without merit,

and ultimately would have failed.  Because the evidence at trial was adequate, and

there was no miscarriage of justice in the jury's verdict, under Rule 33 the Morans

14

were not entitled to new trial. And if this court had granted the Morans a new trial, the government would have appealed that order to the First Circuit, which would have reversed. Therefore, even if there was an error by the attorneys, the Morans suffered no prejudice: the Morans were not entitled to new trials, and they would not have obtained them.

C.    **Section 2255 and Claims of Ineffective Assistance**

Section 2255 relief is reserved for errors of constitutional dimension and grave injuries which if left unaddressed, would result in a complete miscarriage of justice.  United States v. Placente, 81 F.3d 555, 558 (5th Cir. 1996); United States v. Seyfert, 67 F.3d 544, 546 (5th Cir. 1996). Claims of ineffective assistance of counsel are cognizable on collateral review, but the standards are strict.  The benchmark for judging any claim of ineffective assistance of counsel, however, is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. Strickland v. Washington, 466 U.S. 668, 688 (1984). But "the cases in which habeas petitioners can properly prevail [on them] . . . are few and far between." Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995)(parenthetical added). The burden is on the defendant to demonstrate ineffective assistance by a preponderance of the evidence. Lema v. United States, 987 F.2d 48, 51 (1st Cir.

1993).  But because of the strong presumption that counsel's representation was reasonable, the burden is a "very heavy" one.  Id.

Strickland, 466 U.S. 668, sets forth a two-prong test for deciding ineffective assistance of counsel claims. First, the defendant must "show that counsel's performance was deficient." 466 U.S. at 697. Second, the defendant must show that the defective performance resulted in actual prejudice to him. A court need not address both components, or prongs, of the inquiry if the petitioner makes an insufficient showing on one component.  Strickland, 466 U.S. at 694; see also Weeks v. Jones, 26 F.3d 1030, 1037 (11th Cir. 1994).  When a petitioner fails to make a sufficient showing of prejudice, the court need not even address the adequacy of his counsel's performance.  Strickland, 466 U.S. at 697;  Tafero v. Wainright, 796 F.2d 1314, 1319 (11th Cir. 1986).

16

1.    **Strickland's Performance Prong**

For the first <u>Strickland</u> prong, the performance prong,  the defendant "must show that counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. An attorney's performance is only deficient when it is "so inferior as to be objectively unreasonable." <u>Dure v. United States</u>, 127 F.Supp 2d 276, 279 (D.P.R.  2001); <u>see</u> <u>United States v. McGill</u>, 11 F.3d 223, 226 (1st Cir. 1993).  Application of this standard requires that judicial scrutiny of counsel's performance be highly deferential, and <u>Strickland</u> warns courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . considered to be sound trial strategy." 466 U.S. at 689.  Under <u>Strickland</u>, the Morans must show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.   Stated another way, under <u>Strickland</u> the petitioner must "demonstrate that his counsel's error clearly resulted from neglect or ignorance rather than from informed, professional judgment." <u>Barrett v. United States</u>, 965 F.2d 1184, 1194 (1st Cir. 1992).

In evaluating counsel's performance, the standards are "to be applied not in hindsight, but based on what the lawyer knew, or should have known, at the time his tactical choices were made and implemented." <u>United States v. Natanel</u>, 938 F.2d 302, 309 (1st Cir. 1991); <u>Barrett</u>, 965 F.2d at 1193. At all times, the court

must remember that there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. <u>Strickland</u>, 466 U.S. at 689; <u>Robertson v. United States</u>, 144 F.Supp.2d 58, 66 (D.R.I. 2001). All that the Morans were entitled to was an effective defense, not a perfect one nor a successful one. <u>Robertson</u>.

The question to be considered is whether the defendants received the "reasonably effective assistance" of counsel, which is judged against "an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 687-88. The purpose of conducting this analysis "is simply to ensure that criminal defendants receive a fair trial," rather than to determine through hindsight whether a defense attorney could have done a better job. <u>Id.</u> at 689.

For the first prong, an attorney's admission of a mistake, even if true, does not establish ineffective assistance, because the inquiry is limited to whether the course chosen by counsel, even if not a deliberate choice between several options, might have been a reasonable one under the circumstances. <u>Chandler v. United States</u>, 218 F.3d 1305, 1315-16 (11th Cir. 2000); <u>see also</u> <u>Tarver v. Hopper</u>, 169 F.3d 710, 716 (11th Cir. 1999)(noting admissions of deficient performance are not significant); <u>Atkins v. Singletary</u>, 965 F.2d 960 (11th Cir. 1992)(counsel's ineffectiveness is a question that the court must decide, so admissions of deficient performance by attorneys are not decisive). The question to be answered is not

what defendants' counsel did or did not do, but whether some reasonable lawyer may have acted, in the same circumstances, as defense counsel acted, or whether some reasonable lawyer could have taken the same course. <u>Chandler</u> at 1315, 1316 n.16.

The purpose of reviewing counsel's performance is not to grade it, but to determine whether counsel's performance was reasonable under prevailing professional norms. <u>Chandler</u>, 218 F.3d at 1313. The Eleventh Circuit, citing <u>Strickland</u>, has recognized that "'representation is an art, and an act or omission that is unprofessional in one case, may be sound or even brilliant in another.'" <u>Id.</u> The First Circuit has warned that "[t]he practice of law is not a mechanical exercise (like say, kicking a footpress), and an inquiring court must leave ample room for variations in professional judgment." <u>Ouber v. Guarino</u>, 293 F.3d 19, 25 (1st Cir. 2002)(<u>citing</u> <u>Strickland</u>, 466 U.S. at 689). The reasonableness of counsel's performance is an objective inquiry where the question to be asked is, not what the best lawyers would have done or what most good lawyers would have done, but whether some reasonable lawyer could have acted, in the same circumstances, as defense counsel acted. <u>Chandler</u>, 218 F.3d at 1315 (internal citations omitted).

"Because counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." <u>Chandler</u>, 218 F.3d

at 1315.  When strategy is a consideration, the court need not attempt to divine the thoughts underlying counsel's mental process; if counsel pursued a certain course, even if it was not a deliberate choice between several options, this court's inquiry is limited to whether the course chosen by counsel might have been a reasonable one under the circumstances.  Id. at 1316, n. 16.  To make its reasonableness determination, this court looks at the acts or omissions of counsel that the petitioner alleges are unreasonable and asks whether some reasonable lawyer could have taken the same course.  Id.

      2.    **Strickland's Prejudice Prong**

Under the second Strickland prong, the prejudice prong, the Morans must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. In this context, "a reasonable probability of a different result is a probability sufficient to undermine confidence in the outcome" of the trial.  United States v. Balzano, 916 F.2d 1273, 1292 (7th Cir. 1990); Valenzuela v. United States, 261 F.3d  694 (7th Cir. 2001). Furthermore, the Morans must show that, due to counsel's performance, the trial was "fundamentally unfair or unreliable." Valenzuela; Williams v. Washington, 59 F.3d 673, 682 (7th Cir. 1995).

The Supreme Court has rejected "detailed guidelines" as well as intrusive post-trial inquiries into attorney performance, requiring instead that courts "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," (Strickland, 466 U.S. at 690; Murchu v. United States, 926 F.2d 50, 58 (1st Cir. 1991)(same)), and giving counsel's trial decisions a wide berth:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Strickland, 466 U.S. at 689 (citations and quotations omitted).

Indeed, not every "error amounts to ineffectiveness." Cofske v. United States, 290 F.3d 437 (1st Cir. 2002)(citing Lema, 987 F.3d at 51)). Defense counsel must make tactical decisions, and decisions, whether "wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim for

ineffective assistance" of counsel. <u>United States v. Ortiz Oliveras</u>, 717 F.3d 1, 3

(1st Cir. 1983); <u>Cohen v. United States</u>, 996 F. Supp. 110, 113 (D. Mass. 1998).

Objectively speaking, the Morans's attorneys rendered them effective

counsel: Nora Moran's attorney obtained her acquittal on Count 4 (charges of bank

fraud). This is a significant factor in determining whether Nora Moran's attorney

provided effective counsel. <u>Devaney v. United States</u>, 47 F.Supp. 2d 130, 134 (D.

Mass. 1999)(finding counsel was not ineffective, and noting they obtained

acquittal on various charges).

3.    **Counsel's Background Makes it Unlikely That They Were Deficient and There Were Valid Tactical Reasons for Their Acts**

The Morans received excellent, first-tier legal assistance from two of

Boston's best criminal trial attorneys. Indeed, their attorneys (Francis Dimento and

Kenneth Fishman) should be considered as two of the best criminal trial attorneys

in the nation. Given this high level of skill, it is very, very unlikely that their

decision not to file a new trial motion under Fed.R.Crim.P. 33 was a mistake, an

oversight, negligence, or an act of ignorance. Instead, it was much more likely that

it was a tactical decision.

John Moran's attorney, Francis Dimento, is a graduate of Harvard

University and its law school. (see attached Exhibit 3, background information on

22

Dimento). He has an "AV" rating from Martindale-Hubbell, which is its highest rating for attorney competence. Id. Dimento has appeared as counsel in federal cases where there are 97 published opinions, and he has been a member of the bar since 1951. Id. The vast majority of the cases with published opinions were criminal matters.

Nora Moran's attorney, Kenneth Fishman, is a graduate of the University of Pennsylvania and the Suffolk University law school. (see attached Exhibit 4, background information on Fishman). Fishman has appeared as counsel in federal cases where there are 57 published opinions, and he has been a member of the bar since 1977. The vast majority of the cases where there were published opinions were criminal matters. Fishman, along with his former partner F. Lee Bailey, is the author of several leading texts for use in criminal practice. Id. The texts include "Criminal Trial Techniques," "Defending Business and White Collar Crimes," and "Complete Manual of Criminal Forms." Id.  In the case of United States v. Farrah, 128 F.Supp.2d 103, 105 (D. Ct. 2001), the court wrote that Fishman "has extensive experience in criminal defense, has been practicing criminal law for over 20 years and is highly skilled." In that case, the court denied a Section 2255 petition which claimed that Fishman and Bailey had provided ineffective assistance of counsel in a trial.

23

Fishman's trial experience has been both extensive and successful. For example, in United States v. Dunn, Criminal No. 97-10338-WGY (D. Mass.), Fishman obtained a not guilty verdict for a defendant in a high-profile case involving the alleged theft of baseball memorabilia which had belonged to Ted Williams. In the case of United States v. Flemmi, Criminal No. 94-10287-MLW (D. Mass.), Fishman was lead counsel in the long-running proceedings regarding FBI misconduct held before Judge Wolf (and the First Circuit). In the last opinion in that saga, United States v. Flemmi, 195 F.Supp.2d 243, 253 (D. Mass. 2001), Judge Wolf praised Fishman:

> I would also like to commend Kenneth Fishman for his highly professional representation of Flemmi. . . This consuming case has undoubtedly injured his practice and had an adverse financial effect on his family. Yet his dedication to his client and to the adversary system of justice has not wavered. In representing Flemmi, Mr., Fishman has extended a great tradition in this country. In 1770, a young patriot trying to develop a fledgling law practice took a case that no other attorney would accept. John Adams agreed to represent the English soldiers accused of murder in what came to be known as the Boston Massacre.

In 2002, Governor Jane Swift appointed Fishman to the bench. The "Boston Herald" in an editorial praised Fishman, pointing out Judge Wolf's views:

> But don't take our word for it. Take instead the word of U.S. District Court Judge Mark Wolf, as no-nonsense a jurist as ever sat on the federal bench. At Flemmi's sentencing, Wold entered into the record particular praise for Fishman's [representation of Flemmi]. Wolf compared Fishman to the young John Adams, who early in his legal career defended the British soldiers accused of the Boston Massacre. Frankly, for a defense counsel it doesn't

24

get any better than that. Fishman will be a fine addition to the bench and a credit to the governor who named him

"Boston Herald," "Swift Court Moves a Mixed Bag," December 2, 2002, at 22 (parenthetical added).

In light of their backgrounds and experience, it is not likely that Dimento and Fishman made, objectively speaking, an error in seeking only acquittal under Rule 29 and not a new trial under Rule 33. The fact that Fishman later requested a new trial under Rule 33 does not call into question the wisdom of his prior tactical decision.

As of July 15, 1999, when the Rule 29 motion was filed, there were valid tactical reasons for only seeking acquittal, including:

1.    The court had recently granted Nora Moran's Rule 29 motion and dismissed Count 4, so counsel had the potential for momentum with the court to obtain acquittal on all counts;

2.    Because of the recent arguments of counsel regarding Rule 29, the court was familiar with how Rule 29 applied to the case;

3.    At the end of trial, the court had reserved judgment on the Rule 29 motions as to all counts, so there was the possibility that counsel could get all the counts dismissed;

4.    Acquittal, and the end of the case, was the real goal for the Morans, and not a new trial where the government might be able to present a stronger case, which would include the government's ability to read to the jury John Moran's false direct examination testimony and its cross examination as part of its case-in-chief as a party-opponent's admissions (Fed.R.Evid. 801(d)(2)(A)).

5.      Introducing an alternative request for a new trial might dilute the Morans's main goal of full dismissal, and it would force the court to focus upon two rules as applicable to the case;

6.      A concern that if a new trial was granted, that a new judge might be assigned to the case who, for whatever reasons, would impose a stiffer sentence upon the Morans or otherwise be less favorable for their cause.

Significantly, neither the affidavits filed by Dimento or Fishman discuss these issues. And Fishman's affidavit, filed in May 2005, almost six years after the fact, does not deny that his motion was based upon tactical considerations. Instead, all Fishman stated is that "[t]o the best of my memory, there was no tactical or strategic reasons" for failing to file a Rule 33 motion. Such a statement is a far cry from a statement that Fishman's act were <u>not</u> the product of tactical considerations.

And in any event, Fishman's personal thoughts and views do not control: the <u>Strickland</u> determination is based upon whether a reasonable attorney would have undertaken the same course of conduct. If so, there was no violation of <u>Strickland</u>'s first prong, and the Morans did not receive substandard legal service. As Judge Selya wrote in <u>Moran II</u>, 393 F.3d at 10:

> There are both tactical and strategic reasons why a party might seek a judgment of acquittal but not a new trial (for example, a fear that the prosecution will learn from its mistakes and put in a more persuasive case the second time around, a fear that the decisionmaker will take a request for acquittal less seriously if a possible compromise – such as a new trial – is on the table, or a fear that a shift in judges will lead to a stiffer sentence).

26

These are all valid tactical reasons why Fishman, on July 15, 1999, did not seek a

new trial. As such, there was no violation of <u>Strickland</u>'s performance prong.

D.    **<u>Rule 33 New Trial Orders</u>**

Even assuming there was an error in counsel's performance, under

<u>Strickland</u> the Morans still must establish prejudice, <u>i.e.</u>, that a timely new trial

motion had merit. As the First Circuit wrote in <u>Moran II</u>, 393 F.3d at 11, it is

doubtful whether this court would have granted a new trial under Rule 33 if timely

motions had been filed. But it is equally clear that if a new trial had been granted,

the government would have successfully appealed that decision to the First Circuit.

Rule 33 did not allow for a new trial in this case, so the failure timely to request a

new trial did not prejudice the Morans.

A court may order a new trial under Fed.R.Crim.P. 33, which states in part,

"on a defendant's motion, the court may grant a new trial to that defendant if the

interests of justice so require." Courts are exceedingly reluctant to grant new trials,

especially where the defendants have vigorously assaulted the verdicts in both the

district court and the appellate courts. 3 C. Wright & A. Miller, <u>Federal Practice &</u>

<u>Procedure</u>, Section 557 (1982). A new trial will be granted sparingly, and "only

where a miscarriage of justice would otherwise result." <u>United States v. Conley</u>,

249 F.3d 38, 45 (1st Cir. 2001). The government can appeal a new trial order (<u>see</u>

18 U.S.C. 3731), and on appeal where "it is contended that the district court applied an incorrect legal standard, that contention is reviewed de novo." Conley, 249 F.3d at 44. Motions for new trials based upon weight of the evidence are not favored, and courts will only grant them sparingly and with caution, doing so only in those really exceptional cases. United States v. Martinez, 763 F.2d 1297, 1312-13 (11th Cir. 1985).

Where the defendant claims a miscarriage of justice exists because of the alleged lack of evidence supporting his conviction, Rule 33 imposes:

> definite limits upon a district court's right to upset a jury verdict. A district judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result. Thus, where the award of a new trial is predicated on the district court's evaluation of the weight of the evidence rather than its concern about the effect of prejudicial acts that may have resulted in an unfair trial . . . it [must be] quite clear that the jury has reached a seriously erroneous result.

United States v. Rivera-Rangel, 396 F.3d 476, 486 (1st Cir. 2005)(parenthetical in original, quotation marks omitted)(quoting United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986)). In Rivera-Rangel, after a guilty verdict, the trial judge granted an acquittal under Rule 29 and a new trial under Rule 33. The First Circuit, on appeal, found that the evidence was sufficient to support the convictions ("there was ample evidence to support the verdict," 396 F.3d at 486), and reversed the acquittal order. It next addressed the new trial order, and concluded that

28

because the evidence was ample, that "it is not clear that the jury . . . reached a seriously erroneous result." 396 F.3d at 486.

Other First Circuit cases are similar, and where the evidence at trial was sufficient, even though it was sharply conflicting, a new trial is not proper. See United States v. Santos, 131 F.3d 16 (1st Cir. 1997)(no miscarriage of justice where the government and the defendant offered competing evidence regarding his sanity). In United States v. Ruiz, 105 F.3d 1492 (1st Cir. 1997), an arson case, "the trial evidence was in conflict," and the

> largely circumstantial nature of the proof in this case gave rise to competing plausible inferences, some pointing to guilt and others to innocence. The jury is charged with choosing between such inferences, and having had the opportunity to observe Santo's trial testimony and demeanor, it saw fit to convict him on all counts. While reasonable people could have found otherwise, a trial judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result. . . [W]e cannot say the jury reached a seriously erroneous result.

105 F.3d at 1502. In summary: [A] the First Circuit has "emphatically stated that a trial judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result," and [B] a new trial is not allowed "unless it is quite clear that the jury has reached a seriously erroneous result." Rothrock, 806 F.2d at 322. The Morans do not come close to this high standard.

In <u>United States v. Cox</u>, 995 F.2d 1041 (11th Cir. 1993), the court discussed

the standard by which it reviews decisions to grant motions for new trial on

insufficiency/witness credibility grounds:

> When a court's grant of a motion for a new trial comes before us, we
> are faced with two conflicting views of the case. In a criminal case, as
> here, the jury has told us that the defendant is guilty beyond a
> reasonable doubt, while the court, by granting a new trial, has told us
> that the jury was wrong and that the evidence weighed heavily against
> the verdict of twelve men and women honest and true. Given the
> disagreement between the judge and jury below, and despite the label
> abuse of discretion that we have attached to our review of grants and
> denials alike of motions for a new trial, we have, not surprisingly,
> accorded grants of such motions less deference than denials.

995 F2d. at 1044; <u>see also</u> <u>Id</u>., 995 F.2d at 1044 ("new trials should not be granted

on evidentiary grounds unless, at a minimum, the verdict is against the great—not

merely the greater—weight of the evidence")(internal citations omitted).

In <u>Martinez</u>, 763 F.2d at 1312-13, the court concluded " [t]he court may not

reweigh the evidence and set aside the verdict simply because it feels some other

result would be more reasonable. The evidence must preponderate heavily against

the verdict, such that it would be a miscarriage of justice to let the verdict stand");

<u>see</u> <u>Tennant v. Peoria & P.U. Ry. Co.</u>, 321 U.S. 29 (1944)(similar); <u>Redd v. City of</u>

<u>Phenix City</u>, 934 F.2d 1211, 1215 (11th Cir. 1991)([w]here there is some support

for a jury's verdict, it is irrelevant what we or the district judge would have

concluded").

Because determining the credibility of a witness is within the sole province of the jury, an appellate court cannot overturn a jury's decision to believe a witness. <u>United States v. Chastain</u>, 198 F.3d 1338, 1350 (11th Cir. 1999); <u>United States v. Hewitt</u>, 663 F.2d 1381, 1385 (11th Cir. 1981) (jury entitled to believe government's witnesses even if they consist of "an array of scoundrels, liars and brigands").  Only in instances where a witness' testimony is incredible as a matter of law, <u>i.e.</u>, testimony as to events that could not have occurred under the laws of nature, will it be considered for purposes of determining sufficiency of the evidence. <u>United States v. Stitzer</u>, 875 F.2d 1506, 1515 (11th Cir. 1986) (citations omitted).  As stated bluntly in <u>United States v. Rivera</u>, 775 f.2d 1559 (11th Cir. 1985), in which the credibility of a witness named Weiss was much questioned, "In the face of extensive impeachment of Weiss on cross examination concerning Weiss' bad acts and bad character, the jury chose to believe him.  There the matter ends." <u>Id.</u> at 1562. In this case, no government witness  offered testimony which was incredible as a matter of law.  Edmund Noke was a government witness whom the defendants roundly attacked; but the jury decided to credit his testimony. And that ends the matter: no further attacks upon Noke should be allowed. The evidence was sufficient, and ample, to support the guilty verdicts. No new trial was supported in this case.

1.    **Effect of New Trial Order**

A timely Fed.R.Crim.P. 33 motion would have been fruitless for the Morans.

The evidence did not preponderate heavily against the jury's verdict.  If the Court

had heard and granted a new trial motion, there can be no doubt that the

government's first appeal (<u>Moran I</u>) would have included this ruling. And in the

First Circuit, the government would have obtained reversal of the order, based

upon the cases cited above. As such, there could be no prejudice to the Morans.

<u>Moran II</u>, 393 F.3d at 11; <u>Butcher v. United States</u>, 368 F.3d 1290 (11th Cir.

2004).

Presumably the Morans would argue that the same factors relied upon  by

this court for its decision to grant acquittals would also support new trial orders.

This court interpreted the facts and evidence, and concluded that they were

insufficient to support conviction.  But the First Circuit disagreed.  It has twice

affirmed the Morans' convictions, finding the evidence as for John Moran and

Nora Moran was sufficient and ample. Therefore, a new trial order from this court,

reviewed on appeal by the First Circuit would have been reversed.  Because the

new trial motions were ultimately doomed, the Morans cannot show that they have

been prejudiced by their attorneys' failure to file them. <u>Moran II</u>, 393 F.3d at 11.

Butcher, 368 F.3d at 1294-95, is strikingly similar to this case. There the district court, after verdict, granted a Rule 29 acquittal. The government appealed to the Eleventh Circuit, which reinstated the verdicts. Upon remand and before sentencing, the defendants filed belated Rule 33 new trial motions, which the trial court denied. The district court imposed sentence, and the defendants appealed, and the Eleventh Circuit affirmed the convictions. The defendants then filed Section 2255 actions, claiming that they had received ineffective assistance of counsel because of the untimely new trial motions. They claimed that the motions would have been granted. The district court agreed, and granted Section 2255 relief. But on the government's appeal, the Eleventh Circuit ruled that the defendants did not suffer any prejudice under Strickland. That was so because the Rule 33 motions, even if timely, would not have been upheld on appeal: even if the trial count had granted the motions, under controlling law the Eleventh Circuit would have reversed. Thus, in determining prejudice under Strickland, the court must consider how the First Circuit would rule regarding any new trial motion. Moran II, 393 F.3d at 11.

Under Strickland, to find prejudice resulting from counsels' actions, the reviewing court must find that the proceeding was rendered unreliable or fundamentally unfair based on counsels' failure to file the new trial motion. See

Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)(criminal defendant alleging prejudice must show counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable).  Contrary to the Morans' claim that the timely filing and granting of the new trial motion would have changed the outcome sufficiently to establish prejudice, such is not the case.  On review, the focus is not be solely on the outcome in the district court; the court must also consider whether the result of the proceeding was fundamentally unfair or unreliable due to counsel's errors.  Id.  Because the Morans were not entitled to a new trial, the fact that counsel did not file a new trial motion did not result in a trial whose result was fundamentally unfair or unreliable. Indeed, the trial itself was free from reversible error, as the First Circuit has held in two opinions.

In the instant case, where the verdicts were not against the weight of the evidence, and where the evidence did not preponderate heavily against the verdict, the Morans have failed to establish that they were prejudiced by their counsels failure to file a new trial motion.  Had the district court granted a new trial, a review of the order by the First Circuit, in light of the trial evidence, would have resulted in reversal of the court's order. It must be presumed that the First Circuit would follow the law and its precedent; if so, the new trial order would be reversed. Under Strickland, there was no prejudice to the Morans.

And regarding Strickland's performance prong, under the circumstances of the instant case, it is not difficult to see that reasonable counsel might have chosen to move only for a judgment of acquittal rather than to simultaneously move for judgment of acquittal and for a new trial.  Under these circumstances, it is not difficult to see that a reasonable lawyer, knowing the court's receptivity to dismissing Count 4, might make the strategic decision to move only for a judgment of acquittal rather than making a simultaneous motion for a new trial.  Presented with these same facts, a reasonable attorney might decide it was better only to give the court the option of ending the case outright with a judgment of acquittal rather than giving the court the alternative of granting a new trial, an alternative that would have been less attractive to the defendants.  Accordingly, the Morans cannot show that under these circumstances "no competent counsel would have taken the action that [their] counsel did take." Chandler at 1315.

III.    **Conclusion**

The motions should be denied and dismissed with prejudice.

Respectfully submitted,

MICHAEL SULLIVAN
UNITED STATES ATTORNEY

s/Christopher L. Varner
Special Assistant U.S. Attorney
U.S. Attorney's Office
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
313-226-9684-Direct
313-226-3413-Fax
Bar ID: 413642 (D.C.)
E-mail:    Christopher.Varner@usdoj.gov

Date: July 13, 2005

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher L. Varner, certify that on July 13, 2005, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following persons:

Kimberly Homan
The Statler Building
20 Park Plaza, Suite 905
Boston, MA 02116
617-227-8616-Tel.
617-338-9538-Fax

Martin Weinberg
The Statler Building
20 Park Plaza, Suite 905
Boston, MA 02116
617-227-3700-Tel.
617-338-9538-Fax


_____
s/Christopher L. Varner
Special Assistant U.S. Attorney
U.S. Attorney's Office
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
313-226-9684-Direct
313-226-3413-Fax
Bar ID: 413642 (D.C.)
E-mail:        Christopher.Varner@usdoj.gov

## **ATTACHMENTS**

1.    United States v. Moran, 312 F.3d 480 (1st Cir. 2002)

2.    United States v. Moran, 393 F.3d 1 (1st Cir. 2004)

3.    Information regarding Francis Dimento

4.    Information regarding Kenneth Fishman

312 F.3d 480
312 F.3d 480
**(Cite as: 312 F.3d 480)**
**H**

Briefs and Other Related Documents

United States Court of Appeals,
First Circuit.
UNITED STATES of America, Appellant,
v.
John MORAN and Nora Moran, Defendants,
Appellees.
No. 00-2097.

Heard July 30, 2002.
Decided Sept. 23, 2002.
Rehearing and Suggestion for Rehearing En Banc
Denied Dec. 11, 2002.

Following jury verdict finding bank's attorney and bank director guilty of bank fraud and conspiracy to commit bank fraud, motion for judgment of acquittal was granted by the United States District Court for the District of Massachusetts, Reginald C. Lindsay, J. Government appealed. The Court of Appeals, Greenberg, Senior Circuit Judge, sitting by designation, held that: (1) ruling on second motions for judgment of acquittal erroneously considered record as of time of first motions; (2) evidence was sufficient to support finding that attorney was guilty of bank fraud; (3) evidence was sufficient to find director guilty of bank fraud; and (4) evidence was sufficient to find attorney and director guilty of conspiracy to commit bank fraud.

Reversed and remanded.

Boudin, Chief Circuit Judge, filed concurring opinion.

West Headnotes

[1] Criminal Law ☞1139
110k1139
Court of Appeals reviews determinations under motion for judgment of acquittal
de novo. Fed.Rules Cr.Proc.Rule 29, 18 U.S.C.A.

[2] Criminal Law ☞1144.13(2.1)
110k1144.13(2.1)

[2] Criminal Law ☞1144.13(5)
110k1144.13(5)

[2] Criminal Law ☞1159.2(8)
110k1159.2(8)

(Formerly 110k1134(8))

[2] Criminal Law ☞1159.2(9)
110k1159.2(9)
In reviewing a motion for judgment of acquittal, appellate court considers all the evidence, direct and circumstantial, and resolves all evidentiary conflicts in favor of the verdict, but does not weigh credibility of witnesses or assess whether prosecution succeeded in eliminating every possible theory consistent with defendant's innocence. Fed.Rules Cr.Proc.Rule 29, 18 U.S.C.A.

[3] Criminal Law ☞1159.2(3)
110k1159.2(3)

(Formerly 110k1134(8))
In review of a motion for judgment of acquittal, as long as the guilty verdict finds support in a plausible rendition of the record, it must stand.
Fed.Rules Cr.Proc.Rule 29, 18 U.S.C.A.

[4] Criminal Law ☞753.2(8)
110k753.2(8)
Trial court had denied motions for judgment of acquittal made at close of government's case, rather than reserved its judgment, and therefore its ruling on second motions for judgment of acquittal, made at close of trial, was erroneous, inasmuch as decision was made on basis of record as it existed at end of government's case in chief rather than at end of trial; court could not act on original motions for judgment of acquittal and so was required to consider the full record when acting on second motions. Fed.Rules Cr.Proc.Rule 29(b), 18 U.S.C.A.

[5] Banks and Banking ☞509.10
52k509.10
To prove bank fraud, government must show that defendants (1) engaged in a scheme or artifice to defraud or obtain money by means of materially false statements or misrepresentations, (2) from a federally insured financial institution, and, (3) did so knowingly. 18 U.S.C.A. § 1344.

[6] Banks and Banking ☞509.10
52k509.10
In general, ascertaining whether a scheme is fraudulent is measured in a particular bank fraud case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community. 18 U.S.C.A. § 1344.

312 F.3d 480
**(Cite as: 312 F.3d 480)**

[7] Banks and Banking ⬅509.10
52k509.10
In a prosecution for bank fraud, bank need not be the immediate victim of the fraudulent scheme and need not have suffered actual loss so long as requisite intent is established and bank was exposed to a risk of loss. 18 U.S.C.A. § 1344.

[8] Criminal Law ⬅29(5.5)
110k29(5.5)
Each distinct execution of a scheme to defraud constitutes a separate indictable offense under bank fraud statute. 18 U.S.C.A. § 1344.

[9] Banks and Banking ⬅509.25
52k509.25
Evidence was sufficient, in prosecution for bank fraud, to support guilty verdict against bank's closing attorney, even though memory of loan officer was faulty and many of bank's records were in disarray or missing; attorney had duty to inform bank that he stood to receive a percentage of successfully borrowed amounts, and to disclose his profit stake in projects to be financed by loans, loan officer did not recall defendant making any disclosures, bank records and attorney's records did not document attorney's outside arrangements, attorney's testimony was discredited, and attorney took active steps to eliminate paper trail. 18 U.S.C.A. § 1344.

[10] Witnesses ⬅88
410k88
Though a criminal defendant by right may opt to testify, he does so at his or her own peril. 18 U.S.C.A. § 3481.

[11] Banks and Banking ⬅509.25
52k509.25
Evidence was sufficient, in prosecution for bank fraud, to support guilty verdict against bank director whose husband, as bank's closing attorney, failed to inform bank that he stood to profit from loan arrangement, even though it was not clear if director participated in board's vote to approve loans; director, who was familiar with duties of disclosure governing fiduciaries, admitted to being aware of her husband's outside dealings and chose not to disclose the conflicts, and she signed papers setting up trust to hold profits. 18 U.S.C.A. § 1344.

[12] Banks and Banking ⬅509.25
52k509.25
Evidence was sufficient, in prosecution for bank fraud, to support guilty verdict, on basis of aiding and abetting liability, against bank director whose husband, as bank's closing attorney, failed to inform bank that he stood to profit from loan arrangement; director willfully aided and abetted husband's fraud by associating herself with venture and seeking to make it succeed, inasmuch as she admitted to being aware of husband's outside dealings and chose not to disclose the conflicts despite having duty to do so, and she signed papers setting up trust to hold profits. 18 U.S.C.A. § 1344.

[13] Conspiracy ⬅47(4)
91k47(4)
Evidence was sufficient, in prosecution for conspiracy to commit bank fraud, to support conviction of bank's closing attorney and his wife, a bank director; attorney served as mortgage broker on loans he helped obtain from bank while failing to disclose that he stood to profit from arrangement, and director failed to disclose her knowledge of the arrangement and signed papers setting up trust to hold profits. 18 U.S.C.A. §§ 371, 1344.

**\*482** Christopher L. Varner, Assistant United States Attorney, with whom Michael Sullivan, United States Attorney, was on brief for appellant.

Francis J. DiMento with whom DiMento & Sullivan was on brief, for appellee, John M. Moran.

Kenneth J. Fishman with whom Peter Charles Horstman, Julie A. Hamon and Fishman, Anker & Horstman were on brief for appellee, Nora Moran.

Before BOUDIN, Chief Judge, SELYA, Circuit Judge, GREENBERG, [FN*] Senior Circuit Judge.

> FN* Honorable Morton I. Greenberg, of the
> Third Circuit, sitting by designation.

GREENBERG, Senior Circuit Judge.

This case comes on before this court on appeal from a July 13, 2000 memorandum and order of the district court entering a judgment of acquittal for defendants-appellees John Moran and Nora Moran after their jury convictions for bank fraud and conspiracy to commit bank fraud under 18 U.S.C. §§ 1344 and 371. Granting appellees' Fed.R.Crim.P. 29 motions one year after the jury returned the verdicts, the court concluded that the evidence the government submitted in its case-in-chief was insufficient to sustain the convictions. The government challenges that determination on appeal, arguing that the district court erred in failing to consider the full trial record before granting the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

312 F.3d 480
(Cite as: 312 F.3d 480, *482)

motions. The government contends that the evidence, viewed in its totality and with all reasonable inferences drawn in the government's favor as the verdict winner, supported a finding beyond a reasonable doubt that the Morans each knowingly engaged and conspired to engage in a scheme to defraud a federally insured banking institution by actively concealing material information concerning their outside interests in Boston real-estate development projects secured by two loans made by the institution. For the reasons set forth below, we agree with the government and will reverse the judgment of the district court, reinstate the guilty verdicts, and remand the case to the district court for further proceedings.

## I. BACKGROUND

A brief summary of the salient facts follows, though we reserve making a more detailed exposition until we set forth our legal analysis. This appeal grows out of a superseding indictment charging the Morans with bank fraud and conspiracy in connection with two loans the First American Bank for Savings (First American), a federally insured institution, made in December 1986 to real-estate developers Edgar Puente and David Boersner. Puente and Boersner needed financing for two renovation projects seeking to transform brownstone and apartment buildings on Commonwealth Avenue and in West Rutland Square in Boston into condominiums.

John Moran, who for many years on numerous occasions had represented First American as a conveyancing attorney, met with Puente and Boersner in October 1986 to discuss serving as their mortgage broker. Puente and Boersner hired John Moran in that capacity under the self-styled "Moran Holdings," agreeing to pay him a fee equal to 1.5% of any loans he successfully procured for their projects. John Moran subsequently arranged and attended a meeting with Puente, Boersner, and a loan officer at First American, Edmund Noke, which culminated in the parties' agreeing that First American would extend two loans totaling $17 million to Puente and Boersner in exchange for a 40% profit interest in the development *483 projects. The parties further agreed that John Moran would act as the closing attorney for the bank on the loans. In a separate agreement, not involving Noke, Puente and Boersner agreed to give John Moran a 20% profit interest in the projects to be held by the Moran Development Group (MDG) Trust, established by Nora Moran, its sole trustee, on December 15, 1986. [FN1]

FN1. John Moran's interest was 20% of the

share retained by Puente and Boersner, or 12% of the total profit interest.

Nora Moran, who at all times relevant to this appeal was a real-estate broker and the wife of John Moran, was on the Board of Directors of First American, having assumed the office on August 21, 1986. [FN2] First American had adopted a Code of Professional Ethics in 1979 requiring, *inter alia*, that an officer or director disclose any direct or indirect financial interest in a bank loan and disqualify him or herself from participating in the approval process for any such loan. This requirement was consistent with Regulation "O" of the Federal Reserve Board, 12 C.F.R. § 215, which, pursuant to 12 U.S.C. § 375a(10), requires interested directors to disclose fully any personal financial stake or that of their related entities in a given loan and prohibits them from participating directly or indirectly in any vote to extend such credit. The regulation also requires banks to keep records of insider loans to directors, officers, and their related interests and to report annually all insider loans to federal regulators. *See* 12 C.F.R. §§ 215.7 and 215.9.

FN2. Nora Moran was a trustee of the bank from March 1985 until July 1986, when it changed its organizational structure to provide, *inter alia*, that it would have a Board of Directors rather than a Board of Trustees. We use the terms trustee and director interchangeably.

In November 1986, the Morans, Noke, Puente, Boersner, and a representative of Contractors Funding Corporation, a company specializing in construction inspection services, visited the Commonwealth Avenue and West Rutland Square project sites. John Moran subsequently submitted formal, written proposals on behalf of Puente and Boersner seeking non-recourse loans for the projects (which, as opposed to recourse loans, insulate borrowers from personal liability for the amount of the loans). The proposals carried the name Moran Holdings and were signed by John Moran, but did not mention his brokerage or profit arrangement with Puente and Boersner.

Noke sent memoranda summarizing the loan proposals to First American's Executive Committee in December 1986, as all loans for amounts greater than $500,000 required its approval. These memoranda did not mention John Moran's brokerage or profit arrangement with Puente and Boersner. The Executive Committee approved the loans on a recourse basis on December 17, and they closed on December 23 and 24. [FN3] John Moran represented the bank at the closings,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

312 F.3d 480
**(Cite as: 312 F.3d 480, \*483)**

charging $35,500 for his services although he in fact collected only $30,500 on the fee. He also received $255,000 in mortgage brokerage fees from the proceeds of the loans. Furthermore, John Moran kept an additional $52,000 in bank funds in his checking account, which should have been disbursed at the closings.

> FN3. Though it is not essential to our analysis that we do so, we note that the district court cited the discrepant closing date of December 26 for the Commonwealth Avenue project loan, by way of reference to documentation submitted by John Moran to the bank in January 1988. The parties agree and all the other evidence on record indicates, however, that the loan closed on December 24, 1986.

**\*484** On January 15, 1987, the Board of Directors, with Nora Moran in attendance, met to consider an agenda which included a report of the Executive Committee's activities for December 1986. Minutes from a December 17 meeting of the Executive Committee show that two votes were taken, one approving 140 loans totaling $31,098,750 and another approving 13 additional loans totaling $58,961,000 with the Puente/Boersner loans included in the latter group. The Executive Committee's report to the Board, however, included details concerning only the vote on the 140 loans. Nevertheless, the government argued at trial and argues on this appeal that the Board voted to approve the Puente/Boersner loans at the January 15 meeting and that Nora Moran, rather than disqualifying herself because of her financial interest, voted in favor of the loans. Notwithstanding their dispute over what happened at the Board meeting on January 15, 1987, the parties agree that Nora Moran never disclosed to any employee, officer, or agent of First American her husband's status as the mortgage broker for Puente and Boersner or his profit interest in their development projects.

Following the closings, John Moran did not file settlement statements with the bank, forms customarily signed by all the parties and submitted within 30 days accounting for the use of the loan proceeds. Moreover, he did not submit any records documenting his mortgage brokerage arrangement, his 20% interest in the project, or his retention of the additional $52,000 in bank funds. Furthermore, he did not disclose that he used a portion of that money in April 1987 to pay off a loan that Puente and Boersner had secured from Olympic International Bank & Trust Company (where John Moran served as a director) as a down payment towards the purchase of the West Rutland Square

property.

In 1988, First American vice president and general counsel Michael Hanson reviewed the files on the Puente/Boersner projects because the loans were not performing [FN4] satisfactorily and discovered that the settlement statements were missing. After he eventually obtained copies of the statements, Hanson realized that signatures were absent from them and that balances were unaccounted for. He learned also that John Moran had received mortgage brokerage fees from the loan proceeds. Finally, Hanson discovered that John Moran had obtained a 20% profit stake in the Puente/Boersner projects which he expected to satisfy by securing a penthouse apartment in one of the buildings. These understandably disturbing revelations caused Hanson to contact the bank's outside attorneys, the firm of Warner & Stackpole, regarding the Puente/ Boersner loans.

> FN4. In banking jargon, when required payments are not made on a loan it is said to be "performing" unsatisfactorily.

On May 3, 1988, Warner & Stackpole attorneys Stanley Ragalevsky and Samuel Adams met with John Moran and Nora Moran for approximately two hours. According to the memorandum regarding the meeting that Ragalevsky and Adams submitted to First American after the Morans approved it, Nora Moran admitted that she had been aware of her husband's brokerage and profit arrangement by the time the loans were approved. She also admitted that she never volunteered this information to anyone at the bank, believing that her husband had made the appropriate disclosures. John Moran claimed that he had made full disclosure of his interest in the ventures to Noke and had given up his interest in the properties. As a consequence **\*485** of the disclosures in the memorandum and the facts revealed by the related investigation, Nora Moran was asked to resign her director position from the First American Bancorp, Inc., the bank's holding company to which she had moved from the bank proper. The Board of Directors of Bancorp accepted her resignation on June 30, 1988. By October 1990, First American failed and was closed by the FDIC.

On July 9, 1997, a grand jury returned a superseding indictment against John and Nora Moran for bank fraud under 18 U.S.C. § 1344, aiding and abetting bank fraud under 18 U.S.C. § 2, and conspiracy to commit bank fraud under 18 U.S.C. § 371. [FN5] Specifically, counts two and three of the indictment charged that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

John Moran as a closing attorney for First American and Nora Moran as a director of First American committed fraud when, though duty-bound to do so, they failed to disclose their material profit interest in the projects when the $17 million mortgage loans were issued. With respect to the conspiracy, count one of the indictment alleged a number of overt acts, including the formation of the MDG Trust. The two substantive bank fraud counts corresponded to the two bank loans, and the conspiracy count covered conduct from October 1986 to June 1988. The indictment also contained an unrelated fourth count of bank fraud against Nora Moran in connection with her alleged involvement with a loan made by First American to finance the purchase of a property located on Marlborough Street in Boston.

> FN5. The Morans do not claim that the ten-year statute of limitations for bank fraud under 18 U.S.C. § 1344 had run by the time of the indictment. *See* 18 U.S.C. § 3293. In this regard we point out that the indictment charges only acts the prosecution of which had not been barred by the previously applicable five-year statute of limitations as of August 1989. *See* Pub.L. No. 101-73 § 961(*l* )(3).

The trial commenced on May 17, 1999. In its case-in-chief, which lasted 24 days, the government presented evidence purporting to demonstrate that John Moran fraudulently had exploited his position as the bank's closing attorney with respect to the Puente/Boersner projects by failing to disclose his financial interest in them. In particular, the evidence showed that First American's records, including Noke's memoranda to the Executive Committee, did not reflect any disclosure by John Moran of his brokerage arrangement with Puente and Boersner or his profit interest in the properties. For example, the closing settlement statements, which notably John Moran did not sign, indicated only that he received legal fees. Further, the record did not contain any documentary evidence disclosing his status as MDG Trust beneficiary.

Significantly, Noke testified in the government's case that John Moran did not inform him of his economic interest in the Puente/Boersner projects before the loans were submitted to the Executive Committee for approval. Noke claimed that if he duly had been notified he would have prepared an insider transaction report for the bank; no such report was introduced at trial. Ragalevsky and Adams testified that regardless of his possible disclosure to Noke, John Moran was required to notify upper level management in writing of

his financial stake in the projects to satisfy his professional duty as the bank's attorney; no such written disclosure was introduced at trial. The government also elicited testimony from a number of other witnesses on the nature of the professional duties John Moran owed to First American, as well as John Moran's own testimony from another trial acknowledging the ethical and legal duties of a fiduciary.

*486 Government witnesses described with respect to Nora Moran the duties a director owes to a bank, such as that of full and fair disclosure of any facts material to the bank's interests. The government also introduced evidence demonstrating her involvement in the Puente/Boersner loans (visiting the project sites and executing the MDG Trust document) and her failure to inform any bank official of her husband's outside interests regarding the properties. Further, the government attempted to show that Nora Moran voted to approve the loans at the January 15, 1987 Board of Directors meeting on the theory that it was routine practice for loans approved by the Executive Committee to be submitted to the Board of Directors for ratification or modification.

At the close of the government's case, the Morans made motions for judgments of acquittal under Fed.R.Crim.P. 29. The court granted Nora Moran's motion with respect to count four, [FN6] but denied the motions as to the remaining counts. In the defense case, John Moran testified to having made full and timely disclosure of his outside pecuniary interest in the bank loans to Noke. John Moran also testified that in November 1986, he had engaged in a similar transaction in which he functioned as the closing attorney for First American and nevertheless received a $100,000 finder's fee from the borrower. He claimed that he had disclosed this earlier conflict of interest to William Collins, the bank's loan officer on the November 1986 loan.

> FN6. The judgment of acquittal on count four is not before us on appeal.

On cross-examination, John Moran indicated that he had sent a check for $18,750 to his wife via her real estate company on January 15, 1987, the very day of the Board of Directors meeting at issue in this case. John Moran did not indicate on the check what the payment represented, though it was his common practice to do so. The government sought to demonstrate that the Morans routinely commingled their business finances during the relevant time period.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Nora Moran presented only one witness in her defense, an economics expert who discussed the general banking and real estate climate during the relevant time period. The government called William Collins as its rebuttal witness. He testified that he had no recollection of the November 1986 loan about which John Moran testified or of any disclosure John Moran made as to his finder's fee.

At the close of all the evidence, the Morans again moved for judgments of acquittal. The court reserved its ruling and charged the jury which, on July 14, 1999, returned guilty verdicts on the three remaining counts against the Morans. Thereafter, the Morans filed post-trial motions under Fed.R.Crim.P. 29(c) seeking judgments of acquittal. The district court received memoranda and draft transcripts from all parties and on July 13, 2000, on the basis of the submissions issued the decision and order from which the government appeals, entering a judgment of acquittal on all counts for want of evidentiary support. The court made its ruling considering only the evidence introduced on the government's direct case rather than on the full trial record, citing to Fed.R.Crim.P. 29(b), which mandates that a court revisiting a reserved motion for judgment of acquittal may consider only evidence introduced as of the time that the court reserved ruling on the motion.

The court concluded that Noke's testimony and the absence of bank records documenting John Moran's timely disclosure of his brokerage and profit arrangement could not sustain John Moran's convictions *487 on the substantive bank fraud counts as the defense successfully had demonstrated defects in Noke's memory and work performance and in First American's record-keeping practices. The court further concluded that the government failed to show that Nora Moran participated in any vote on or otherwise facilitated the approval of the Puente/Boersner loans and that the evidence therefore was insufficient to sustain the verdicts convicting her of substantive bank fraud. The court did not consider an aiding and abetting theory of liability. Finally, the court concluded that the government's failure to prove the underlying substantive offenses was fatal to the conspiracy convictions of both Morans. The government timely filed a notice of appeal on August 10, 2000. We have jurisdiction over an appeal from a final judgment of the district court pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3731, [FN7] and the district court exercised subject matter jurisdiction pursuant to 18 U.S.C. § 3231.

FN7. 18 U.S.C. § 3731 provides for appellate

jurisdiction over an appeal brought by the government in a criminal case from an order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment. Though the statute in terms does not refer to appeals from orders entering a judgment of acquittal, the Supreme Court has interpreted section 3731 as allowing government appeals in criminal cases "whenever the Constitution would permit." *United States v. Wilson,* 420 U.S. 332, 337, 95 S.Ct. 1013, 1019, 43 L.Ed.2d 232 (1975). Here, double jeopardy principles do not bar appeal by the government because the district court granted the Rule 29 motions after the jury rendered a guilty verdict and the district court will be able to implement our conclusion that the judgment of acquittal was improper simply by entering a judgment on the verdict on remand rather than by requiring the Morans to submit to trial for a second time. *See United States v. Scott,* 437 U.S. 82, 91 n. 7, 98 S.Ct. 2187, 2194 n. 7, 57 L.Ed.2d 65 (1978).

## II. DISCUSSION
### A. Standard and Scope of Review

[1][2][3] We review Rule 29 determinations *de novo*. *United States v. Carroll,* 105 F.3d 740, 742 (1st Cir.1997). At both the trial and appellate level, a court must determine "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. O'Brien,* 14 F.3d 703, 706 (1st Cir.1994). Under this formulation, a court considers all the evidence, direct and circumstantial, and resolves all evidentiary conflicts in favor of the verdict. *Carroll,* 105 F.3d at 742. Thus, we do not weigh the credibility of the witnesses or "assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence." *United States v. Rivera-Ruiz,* 244 F.3d 263, 266 (1st Cir.2001) (internal quotation indication omitted). Accordingly, as long as the guilty verdict finds support in a "plausible rendition of the record," it must stand. *United States v. Ortiz,* 966 F.2d 707, 711 (1st Cir.1992).

We deal initially with the procedural issue attributable to the district court's anchoring its analysis in the record as it existed at the end of the government's case-in-chief. In this regard we hold that our review should encompass the record of the entire trial rather than being confined only to the direct evidence presented by the government. Fed.R.Crim.P. 29(b) permits a court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to reserve deciding a motion for judgment of acquittal until after a jury renders its verdict; if the court chooses to do so, when revisiting the motion it may *488 consider only the record as it stood at the time it reserved its ruling. [FN8]

> FN8. Rule 29(a) and (b) read in full: (a) MOTION BEFORE SUBMISSION TO JURY. Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the government is not granted, the defendant may offer evidence without having reserved the right.
> (b) RESERVATION OF DECISION ON MOTION. The court may reserve decision on a motion for judgment of acquittal, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

[4] The district court, however, denied rather than reserved its ruling on the Morans' initial Rule 29 motions with respect to counts one through three at the close of the government's case. The Morans then introduced evidence, and the government introduced additional evidence in rebuttal. At the close of trial, the Morans again made Rule 29 motions on which the court did reserve its ruling, allowing it to act substantively on the motions after the jury returned its verdict. At that point the court could not act on the original motions for acquittal adjudicated after the government's case-in-chief and thus was required to consider the full record when acting on the Morans' second motions for acquittal.

We are satisfied that simply by labeling its post-trial Rule 29 ruling as a reconsideration and reversal of its earlier Rule 29 ruling, the court could not relate back the time when it reserved its ruling on the motions made at the end of all the evidence to the point at which it denied the first motions for acquittal. After all, if it could do so it effectively would circumvent the

explicit requirement in Rule 29(b) that if a court "reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." Moreover, if the court could deny a motion for acquittal at the end of the government's case-in-chief and then grant it on reconsideration, as a practical matter there would be no distinction between denying a motion for acquittal or reserving a ruling on it for either way the court subsequently could grant the motion on a static record.

### B. Bank Fraud Charges Against John Moran (Counts Two and Three)

[5][6][7][8] To prove bank fraud under 18 U.S.C. § 1344, the government must show that the defendants: (1) engaged in a scheme or artifice to defraud or obtain money by means of materially false statements or misrepresentations; (2) from a federally insured financial institution; and, (3) did so knowingly. *United States v. Kenrick,* 221 F.3d 19, 30 (1st Cir.) (en banc), *cert. denied,* 531 U.S. 1042, 121 S.Ct. 639, 148 L.Ed.2d 545 (2000). [FN9] We *489 have defined "intent to defraud" as "an intent to deceive the bank in order to obtain from it money or other property." *Id.* In general, ascertaining whether a scheme is fraudulent "is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." *United States v. Brandon,* 17 F.3d 409, 424 (1st Cir.1994) (quoting *United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987)). We look to the entire circumstances of the defendants' conduct and any inferences drawn therefrom as an indication of their intent. *See Id.* at 425. Furthermore, the bank need not be the immediate victim of the fraudulent scheme and need not have suffered actual loss so long as the requisite intent is established and the bank was exposed to a risk of loss. *See United States v. Barrett,* 178 F.3d 643, 648 (2d Cir.1999); *see also United States v. Blasini-Lluberas,* 169 F.3d 57, 65 (1st Cir.1999) ("The government need not prove actual loss as a result of the scheme...."). We also note that each distinct execution of a scheme to defraud constitutes a separate indictable offense, for instance where, as here, the government charges that multiple and separate loans were obtained to finance multiple and separate real estate transactions. *Brandon,* 17 F.3d at 422.

> FN9. The bank fraud statute, 18 U.S.C. § 1344, provides:
> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
> (1) to defraud a financial institution; or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(2) to obtain any of the money, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

[9] Considering the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the verdict, we conclude that a jury well could have found beyond a reasonable doubt that John Moran knowingly executed a scheme to defraud First American. As its closing attorney on the Puente/Boersner loans, he had a duty to represent its interests which, at the absolute nadir of potential discharge, required him to inform the bank that as the mortgage broker he stood to reap 1.5% of any successfully borrowed amounts. *See, e.g., United States v. De La Mata,* 266 F.3d 1275, 1293 (11th Cir.2001) (bank officials owe a fiduciary duty to the bank and its depositors, which obligates the avoidance of fraud, bad faith, usurpation of corporate opportunities, and self-dealing); *United States v. Silvano,* 812 F.2d 754, 759 (1st Cir.1987). Likewise, he was required to disclose his divergent profit stake in the real-estate projects that the loans financed. [FN10] There was ample evidence for the jury to conclude that John Moran was aware of his professional responsibilities but did not meet them.

FN10. We emphasize that section 1344 by its literal terms proscribes the knowing execution or attempted execution of a scheme to defraud a financial institution. Accordingly, bank fraud can be proven even if the defendant does not owe a pre-existing disclosure duty to the bank. Thus, evidence of an affirmative misrepresentation, half-truth, or omission of material information made knowingly to a bank to beguile an economic boon from it in itself will suffice to support a conviction. As explained in *United States v. Colton,* 231 F.3d 890, 898-903 (4th Cir.2000), federal bank fraud, consistent with its statutory purpose, extends to active concealment even in the absence of a fiduciary, statutory, or other independent legal duty of disclosure where the defendant acts with the requisite intent to mislead or deceive. While the existence of the defendant's independent duty to the institution is a factor to be considered in evaluating the prosecution's case, for instance with respect to the defendant's state of mind (a bank director or a bank attorney would be harder pressed to claim good faith than an unseasoned layperson), ultimately

proof of a knowing "scheme or artifice to defraud"-- whether executed by affirmative acts or omissions--is all that the statute requires for conviction.

Noke, the loan officer who represented the bank in the transactions, testified that he did not recall John Moran making any disclosures concerning his two-fold financial arrangement with Puente and Boersner. *490 His lack of recollection is notable for two reasons: (1) circumstances where the bank's closing attorney also functioned as a mortgage broker for and co-partner with the bank's clients in the same transaction were rare, and the jury reasonably could have balanced this unusual circumstance against the fact that nothing about the Puente/Boersner loans stood out in Noke's mind; (2) insider arrangements of this nature typically triggered greater scrutiny and generated special paperwork. Accordingly, the absence of bank records documenting John Moran's outside arrangements was another factor that the jury could take into account in concluding that he had concealed the details of his relationship with Puente and Boersner. [FN11] Moreover, in contrast the government introduced insider loan records from June 1986 showing that Elizabeth Finnegan, a trustee of First American, disclosed her financial interest as a principal in American Healthways, Inc. d/b/a Nightingale before a vote was taken to consider increasing the company's line of credit.

FN11. It is also significant that, although he testified, John Moran did not introduce at trial any records documenting his alleged disclosure. Notwithstanding the passage of time, the relocation of offices, or the intervention of allegedly calamitous natural events, one might reasonably expect that John Moran would have been careful to retain copies of any documents disclosing to bank officials his outside dealings with Puente and Boersner considering the intense scrutiny to which the loans were subjected within approximately one year from their approval. Certainly the fact that Nora Moran was asked to resign her director position in the spring of 1988 pursuant to the independent findings of outside counsel strongly would have forewarned John Moran of the utility of preserving with painstaking care any exculpatory documents in his possession.

[10] The Morans, particularly John Moran, mounted three principal lines of attack against the government's non-disclosure theory: (1) many of the bank's records from the relevant time period were in disarray or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

missing; (2) Noke's testimony was undermined to the extent that he could not recall significant details about the transactions or participants in question and by the fact that nearly 10 years had passed from the time that the loans were closed; (3) John Moran testified that he had made the appropriate disclosures. The last fact is critical. Though a criminal defendant by right may opt to testify, *see* 18 U.S.C. § 3481; *Rock v. Arkansas,* 483 U.S. 44, 51-53, 107 S.Ct. 2704, 2709, 97 L.Ed.2d 37 (1987), he does so at his or her own peril. *See, e.g., United States v. Dunnigan,* 507 U.S. 87, 93-98, 113 S.Ct. 1111, 1116-19, 122 L.Ed.2d 445 (1993).

The government discredited John Moran's testimony that he had disclosed his $100,000 finder's fee from the November 1986 loan for which he also represented First American at closing by calling in rebuttal the loan officer involved who, like Noke, did not recall John Moran making any disclosure of a conflict of interest. That testimony, coupled with the unique vantage of the jury to assess John Moran's demeanor and make key credibility determinations concerning his veracity and attention to detail as measured against the lack of independent corroboration for his testimony, permitted the jury, on balance, to disbelieve John Moran on the one hand and credit Noke on the other irrespective of any gaps or arguable inconsistencies in Noke's testimony. *See, e.g., United States v. Romero,* 32 F.3d 641, 646 (1st Cir.1994) (appellate court does not secondguess the jury's decision to credit testimony which contains an inconsistency because it "would usurp the jury's role to reject its decision to believe or disbelieve a witness *491 because of such inconsistencies"). [FN12]

> FN12. We reiterate that the district court failed to consider John Moran's testimony or the government's rebuttal case in its analysis when granting the motions for acquittal.

Inasmuch as a jury could conclude that John Moran failed to disclose his broker relationship with Puente and Boersner and his interest in their projects, the record supports a conclusion that John Moran refrained from making the disclosures knowingly, affirmatively, and with a clear motive to secure a financial windfall at the bank's potential expense. As an attorney for First American, John Moran was positioned uniquely to expedite the process by which Puente and Boersner could obtain financing for their development projects, for instance by bypassing conventional bureaucratic impediments to arrange critical meetings with bank loan officials and inspections of the properties. At the same time, as an experienced real estate attorney, John

Moran was well aware that disclosure of his dual, conflicting broker-client relationship with the loan principals and of his direct interest in the profits generated by their development projects could jeopardize his stake in the venture. [FN13] In fact, the considerable extent to which John Moran stood to benefit from the loans--$250,000 in broker fees and 20% of profits--is further probative of his motive to conceal facts that were potentially outcome-determinative with respect to approval of the loans.

> FN13. That is to say, the information was material because had it been known that John Moran's legal representation was presumptively partial and hence suspect, the bank might have taken steps to protect itself from the very real likelihood of legal action or regulatory liability, for instance by delaying the approval of the loans until a further independent investigation of the loans could be conducted. *See Neder v. United States,* 527 U.S. 1, 16, 119 S.Ct. 1827, 1837, 144 L.Ed.2d 35 (1999) (an omission is material if it is "capable of influencing the decision of the decisionmaking body") (citations and internal punctuation omitted).

Support for a conclusion that John Moran deliberately and deceptively concealed material information is supplied also by the active steps he took to eliminate a paper trail connecting himself to the loans and thereby avert inquiry from bank officials. Specifically, John Moran recruited his wife to function as the only declarant-trustee on the MDG Trust which, being a Massachusetts Business Trust, does not disclose as a matter of public record the identity of its beneficiaries. Thus, John Moran was not linked clearly to the entity. When Puente and Boersner created the Boston Commonwealth Trust and the 76-82 Rutland Square Trust to collect the loan proceeds and take title to their properties, at John Moran's behest they designated MDG as a 20% beneficiary. However, there were no signatures of anyone purporting to represent MDG on the documents setting up the two trusts. Consequently, when a letter from an attorney for Puente and Boersner disclosed to First American that MDG was one of three beneficiaries of the trust that was taking title to the Commonwealth Avenue property, John Moran was insulated because the bank did not have information linking him to MDG. To further maintain his anonymity with respect to MDG, John Moran did not submit the customary post-closing settlement statements or any records regarding the trustees or beneficiaries of the MDG Trust. *See, e.g., United States v. Cauble,* 706 F.2d 1322, 1355 (5th Cir.1983) (considering defendant's "disregard for the bank's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

312 F.3d 480
(Cite as: 312 F.3d 480, *491)

routine practices" relevant to intent to defraud).

In sum, there was sufficient evidence to allow a rational jury to conclude, beyond a reasonable doubt, that John Moran concealed *492 his financial arrangements with Puente and Boersner not as the product of a good faith, honest oversight but rather pursuant to an affirmative endeavor calculated to defraud First American. As the evidence supports the conclusion that John Moran's conduct rose to the level of a knowing "scheme or artifice" to defraud, the bank fraud convictions returned against him must be reinstated.

### C. Bank Fraud Charges Against Nora Moran (Counts Two and Three)

We recognize that the government's bank fraud case against Nora Moran was not as strong as that against John Moran. In this regard it is not clear that at the January 15, 1987 meeting of First American's Board of Directors, Nora Moran participated in a dispositive vote on the loans. Though the government advanced a theory that a vote was taken to ratify the Puente/ Boersner loans, it appears that the Board rubber-stamped as a mere formality a summary report of loans the Executive Committee had approved in December. Moreover, it is not clear that the Board of Directors at that time had the power to reject the Executive Committee's loan decisions.

[11] Nevertheless, the district court erred for two independent reasons when it granted Nora Moran a judgment of acquittal on counts two and three. To begin with, without regard for what transpired on January 15, 1987, [FN14] a rational trier of fact could have found that Nora Moran, who admitted to Ragalevsky and Adams that she was aware of her husband's outside dealings and arrangements concerning the projects prior to the consummation of the transactions at issue, chose not to disclose the conflicts to the appropriate bank officials in her capacity as bank director because she anticipated that a financial windfall would accrue to her husband (and by extension to her) should the loans be approved and feared that a disclosure would undermine the approval process.

FN14. We note that the government's theory of Nora Moran's liability for bank fraud was not limited exclusively to her active participation in the January vote. For instance, the indictment charged that in spite of her fiduciary position and independently of any Board votes or meetings she chose not to disclose her husband's brokerage or profit

arrangement and in fact executed the MDG Trust document in order to facilitate the fraudulent scheme. Furthermore, the government pursued its non-disclosure theory of liability at trial and during its closing argument.

Moreover, there was significant evidence tending to establish Nora Moran's knowing, active participation in the fraudulent scheme: Nora Moran accompanied her husband, Puente, Boersner, Noke, and a construction inspector to visit the project sites in November 1986 before the loan applications were submitted as proposals or approved; a mere two days before the Executive Committee approved the loans, she signed the papers establishing the MDG Trust which functioned as a repository for the 20% interest in the profits generated by the Puente/Boersner development projects; John Moran's secretary, Elizabeth Longo, ordinarily served as a trustee for his real estate transactions, suggesting that such a break from routine likely would have sparked a modicum of inquiry from Nora Moran as to the purpose for the formation of MDG; John and Nora Moran shared financial matters, including filing joint tax returns and transferring funds between their separate business ventures; and, Nora Moran was an astute real estate broker and bank director familiar with the affirmative duties of disclosure governing fiduciaries when confronted with bank transactions that affected *493 them personally. [FN15]

FN15. For example, there was evidence to suggest that it was the bank's practice to provide every director with a copy of the Code of Professional Ethics. Furthermore, Nora Moran attended a July 9, 1986 meeting of the Board of Directors at which Finnegan disclosed her insider stake in the proposed Nightingale loan and abstained from voting.

Considered together, the foregoing facts justified a conclusion that Nora Moran knew of her husband's stake in the outcome of the loans [FN16] and understood that federal banking regulations, First American's Code of Professional Ethics, and her common-law fiduciary status as a bank director required her to make the appropriate disclosures. [FN17] Nevertheless she chose not to divulge the information to maintain the false impression that the loans were not tainted or suspect in any significant way.

FN16. We emphasize further that the jurors, drawing upon common sense and their own

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

life experiences, reasonably might have inferred that spouses such as the Morans in relationships whose probity and openness have not been called into question (for instance before the closings on the loans) are wont to share non-confidential details of their professional lives.

FN17. We note that the district court in its opinion indicated that Nora Moran at least by December 11, 1986, was aware of John Moran's brokerage fee and 20% interest and, in failing to disclose this information, "violated that part of Regulation O and the Bank's Code of Ethics requiring such disclosure." Opinion at 23.

We recognize, as emphasized by the district court, that Nora Moran's conduct may not have directly induced First American to allocate the $17 million in loans to Puente and Boersner or otherwise have influenced anyone involved in the lending decision-making process. [FN18] However, a finding that her conduct had such an impact was not required for a conviction of bank fraud in this case. *See, e.g., Kenrick,* 221 F.3d at 29 (actual reliance by the bank "plainly ha[s] no place in the federal fraud statutes") (quoting *Neder v. United States,* 527 U.S. 1, 25, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35 (1999)). Nor, as Nora Moran suggests is the case, could the evidence establish only that she breached nothing more than a fiduciary duty owed to First American which conduct, standing alone, purportedly cannot constitute bank fraud as a matter of law. [FN19] Rather, the evidence supported a conclusion that Nora Moran knowingly executed the scheme to defraud First American through her deceptive acts (for example, signing the trust documents for the entity holding the 20% profit interest) and omissions (deliberately concealing information that might have delayed or terminated the loan review process) and therefore was a sufficient basis on which the jury could convict her for bank fraud.

FN18. *See* Opinion at 59-60 ("the government failed to present evidence sufficient for a reasonable jury to find that Nora Moran knowingly participated in actions of the Bank that had the effect of causing or facilitating the making of the loans").

FN19. The Court of Appeals for the Fifth Circuit in *United States v. Henderson,* 19 F.3d 917, 923 & n. 7 (5th Cir.1994), confronted a similar claim that mere breach of fiduciary duty cannot constitute a "scheme

or artifice" to defraud under 18 U.S.C. § 1344 but, as we do here, found sufficient evidence of more than such a breach, thus obviating the need to reach the issue. Nevertheless, while "not every breach of every fiduciary duty works a criminal fraud," *United States v. George,* 477 F.2d 508, 512 (7th Cir.1973), we find no federal jurisprudence establishing as a matter of law that a failure to disclose a conflict of interest or a breach of fiduciary duty cannot constitute or aid and abet a scheme to defraud, assuming the requisite materiality and specific intent to deceive for personal gain are established.

[12] Alternatively, these facts make out the essential elements of aiding and **494 abetting liability for bank fraud. [FN20] Thus, even if Nora Moran did not execute or attempt to execute the scheme, there was sufficient evidence to conclude beyond a reasonable doubt that she willfully aided and abetted John Moran's fraud by associating herself with his venture and seeking by her actions to make it succeed. *See* 18 U.S.C. § 2; *see also United States v. Colon-Munoz,* 192 F.3d 210, 223 (1st Cir.1999). Furthermore, the evidence was sufficient on which to premise Nora Moran's culpable state of mind for aiding and abetting liability to the extent that she consciously shared her husband's knowledge of the underlying criminal scheme and intended to participate in it for the purpose of bringing about financial gain.

FN20. We note that an alternative accomplice theory of liability was charged in the indictment, advanced by the government at trial, and presented to the jury in the court's final instructions.

### D. *Conspiracy Charges Against John and Nora Moran (Count One)*

[13] Finally, we find that the government offered sufficient evidence to convict both Morans of the conspiracy to commit bank fraud under 18 U.S.C. § 371. As we elaborated previously, the evidence supported a conclusion that the Morans agreed to participate in a scheme to defraud First American for the common goal of personal pecuniary gain, [FN21] knowingly and voluntarily participated in the conspiracy, and took at least one affirmative overt act in furtherance of the conspiracy. *See Blasini-Lluberas,* 169 F.3d at 67. Accordingly, the jury verdict on the conspiracy count must be reinstated. [FN22]

FN21. Of course, the agreement need not be made expressly nor proved by direct evidence. *See, e.g., United States v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Woodward,* 149 F.3d 46, 67, 68 (1st Cir.1998).

FN22. The district court disposed of the bank fraud conspiracy convictions on the ground that the evidence could not support a conviction against either Moran on the underlying bank fraud substantive offenses. *See* Opinion at 60 ("the failure to establish beyond a reasonable doubt that *either* defendant committed the substantive offense was also a failure to establish beyond a reasonable doubt the agreement between them to commit the offense") (emphasis in original). It did not consider, however, that a defendant can be guilty of the inchoate offense of conspiracy even if he and his co-conspirator are not guilty of the underlying substantive offense so long as he knowingly entered an agreement to commit the substantive offense and participated in the plot to effectuate the offense; success is not a required element. *See, e.g., Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 477, 139 L.Ed.2d 352 (1997) ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable itself."); *United States v. Belardo-Quinones,* 71 F.3d 941, 944 (1st Cir.1995) (conspiracy may exist even if the object of the conspiracy cannot be achieved).

### III. CONCLUSION

For the foregoing reasons, we reverse the judgments of acquittal, reinstate the convictions on counts one, two, and three, and remand the case to the district court for further proceedings.

*Reversed and remanded.*

John Moran and Nora Moran were charged with bank fraud under 18 U.S.C. §§ 1344, 371 (2000). The jury found both defendants guilty, but the district court granted a motion for acquittal as to both defendants. The government has appealed. My concern is with the evidence against Nora Moran.

The government's primary theory in the trial was that Nora Moran, as a director of the bank, had voted to approve certain loans without disclosing her husband's interest in them. In the alternative, the *495 government argued that Nora Moran had an independent duty to disclose her husband's participation on both sides of the bank loan and that, because she fostered John's fraud (as described below),

she was guilty of aiding and abetting. The district court's opinion directing an acquittal discussed the voting theory which it found unsupported by the evidence, but it did not discuss the government's alternative theories.

On appeal, the panel's reinstatement of the jury's verdict does not rely on the government's primary theory, namely, that Nora voted on the loan. As the panel opinion points out, there is no clear proof that Nora knowingly voted on the loan benefitting her husband. The only evidence is that Nora participated in a board of directors' vote that rubber-stamped the approval of a summary report of the loans made in the previous month. A summary report contained only headline numbers and did not specify the underlying loans and their details.

To sustain the jury's verdict as against the district court's judgments of acquittal, one must rely on the government's alternative arguments. Under one theory, Nora failed (as a fiduciary) to reveal her husband's double dealing and therefore committed fraud by that non-disclosure; under the (sounder) aiding and abetting version of the theory, she also took positive steps--such as signing the papers to establish the business trust that was used to conceal the Morans' interest in the loans--to further John's fraud. In either case, it was necessary for the bank fraud conviction to prove that Nora acted with *intent to defraud. United States v. Kenrick,* 221 F.3d 19, 30 (1st Cir.) (en banc), *cert. denied,* 531 U.S. 961, 121 S.Ct. 387, 148 L.Ed.2d 299 (2000), *and cert. denied,* 531 U.S. 1042, 121 S.Ct. 639, 148 L.Ed.2d 545 (2000).

This culpable state of mind with respect to Nora depends on proving four facts: first, that Nora knew of John's participation on both sides of the transaction; second, that she knew that John had not disclosed his conflict of interest to the bank; third, that she knew that she had an obligation to disclose John's position if John did not make the requisite disclosure; and fourth, that she acted dishonestly rather than negligently in failing to disclose. The second condition is doubtful and, if the second fails, the fourth (which depends on the other three) also is infirm.

Nora certainly knew that John was acting for the borrowers; there is clear evidence on this point. What is less clear is whether she knew that John was acting for the bank as well; but this can probably be inferred from her statement that she had understood that John had disclosed his interest to the bank. If John was not also acting for the bank, he would hardly have needed

312 F.3d 480
**(Cite as: 312 F.3d 480, \*495)**

to mention to his wife his alleged disclosure to the bank since there would have been nothing to disclose.

On the second condition--that Nora knew of John's failure to disclose-- the government's evidence is extremely thin. Clearly such a factual predicate is essential: it would be quite a stretch to hold Nora *criminally* liable for failing to make an independent disclosure to the bank, even though she believed that John *had* disclosed his interest in the project. The only evidence as to whether John told her he had disclosed his interest to the bank is Nora's claim that he said he had. The statement was made by Nora *prior* to trial and recorded by a third party. Although inadmissible hearsay if offered by Nora, the recordation was offered into evidence by the government for its own purposes.

Of course, the jury may have disbelieved her statement, made after the fact to bank attorneys investigating the Morans' involvement **\*496** with the loans, as a *post hoc* attempt at exculpation. It is not clear what basis the jury would have had for such a rejection. John certainly could have made such a statement to his wife, truthfully or not; and Nora did not testify at trial so her demeanor was not subject to assessment. Still, the jury could simply not have believed Nora's statement.

We can never know whether the jury found fraudulent intent based on this theory. At trial, the government concentrated primarily on the hopeless theory that Nora had voted on the loans even though it presented its alternative theories as well. Yet in this court Nora does not argue that evidence of fraudulent intent was entirely lacking but argues that her failure to disclose was not material, an unpersuasive position given the reach of the materiality concept. It is not easy to

support the district court's result on the basis of doubts not relied on by the district court in granting the motion, nor urged by the defendant herself on this appeal.

In the district court, Nora moved for a judgment of acquittal based on insufficient evidence; thereafter she argued to the district court that this filing should in the alternative be treated as a motion for a new trial on the same ground. The government takes the position that the alternative request was untimely and did not constitute a proper motion for a new trial. The district court apparently did not rule one way or the other because the alternative request was mooted by the directed judgment of acquittal. On remand, the new trial request and the government's objections remain to be considered.

The district court, already disposed to grant an acquittal outright, may well be inclined to grant a new trial on weight-of-the-evidence grounds, given the collapse of the government's primary voting theory and the thin factual support for the fraudulent non-disclosure claim against Nora. *See, e.g., United States v. Montilla-Rivera*, 115 F.3d 1060, 1067 (1st Cir.1997) . This outcome might well be justified, assuming that Nora's arguments for the timeliness of the new trial motion can overcome the government's asserted objections.

312 F.3d 480

Briefs and Other Related Documents (Back to top)

.                  00-2097                  (Docket) (Aug. 16, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

393 F.3d 1
393 F.3d 1
(Cite as: 393 F.3d 1)

**C**

Briefs and Other Related Documents

United States Court of Appeals,
First Circuit.
UNITED STATES of America, Appellee,
v.
Nora F. MORAN, Defendant, Appellant.
United States of America, Appellee,
v.
John M. Moran, Defendant, Appellant.
Nos. 03-2148, 03-2149.

Heard Nov. 4, 2004.
Decided Dec. 15, 2004.

**Background:** Following jury verdict finding bank's attorney and bank director guilty of bank fraud and conspiracy to commit bank fraud, motion for judgment of acquittal was granted by the United States District Court for the District of Massachusetts, Reginald C. Lindsay, J. The Court of Appeals, 312 F.3d 480, set aside the district court's entry of judgment for the defendants and reinstated guilty verdicts. Following denial of motions for new trial and imposition of sentences on remand, defendants again appealed.

**Holdings:** The Court of Appeals, Selya, Circuit Judge, held that:

(1) manifest injustice did not exist to disturb earlier affirmance of bank director's convictions;

(2) court lacked authority to treat post-trial motion for judgment of acquittal as one for new trial;

(3) ineffective assistance of counsel claim was inappropriate for determination on direct appeal;

(4) defendants were not precluded from raising claims of error that they failed to raise as appellees on government's initial appeal;

(5) omission of materiality requirement from instructions on "scheme to defraud" was not plain error; and

(6) prosecutors did not engage in misconduct violative of due process during closing argument.

Affirmed.

**West Headnotes**

**[1] Courts** ☞99(1)
106k99(1)
The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.

**[2] Courts** ☞99(1)
106k99(1)

**[2] Criminal Law** ☞1192
110k1192
The law of case doctrine has two branches: under first branch, the mandate rule prevents relitigation in the trial court of matters that were explicitly or implicitly decided by an earlier appellate decision in the same case, and under second branch, a legal decision made at one stage of a criminal or civil proceeding should remain the law of that case throughout the litigation, unless and until the decision is modified or overruled by a higher court.

**[3] Courts** ☞99(1)
106k99(1)
Finding of manifest injustice which will permit court to reconsider past decision notwithstanding law of case doctrine requires, at a bare minimum, a definite and firm conviction that a prior ruling on a material matter is unreasonable or obviously wrong, and resulted in prejudice.

**[4] Criminal Law** ☞1180
110k1180
Manifest injustice did not exist under law of case doctrine to disturb appellate panel's affirmance of defendant's convictions on prior appeal on basis of concurring opinion of member of prior panel who, although remarking on "thinness" of evidence against defendant, found evidence sufficient to support conviction.

**[5] Criminal Law** ☞949(1)
110k949(1)
Where the motion papers cannot be fairly construed as a request for a new trial, a district court does not have the authority, sua sponte, to convert a motion for judgment of acquittal into a motion for a new trial. Fed.Rules Cr.Proc.Rules 29, 33, 18 U.S.C.A.

**[6] Criminal Law** ☞951(1)
110k951(1)
Any conversion of postjudgment motion for acquittal into motion for new trial must be made by defendant within time parameters for bringing motion for new trial. Fed.Rules Cr.Proc.Rules 29, 33(b)(2), 18 U.S.C.A.

**[7] Criminal Law** ☞951(1)

110k951(1)
Court lacked authority to treat post-trial motion for judgment of acquittal as one for new trial, even assuming motion contained substantive basis upon which new trial could be granted, where motion gave no overt indication that defendants desired latter relief and defendants did not request conversion of motion until after deadline for filing new trial motion. Fed.Rules Cr.Proc.Rules 29, 33(b)(2), 18 U.S.C.A.

[8] Criminal Law ☞1440(2)
110k1440(2)
Fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court on postconviction relief. U.S.C.A. Const.Amend. 6.

[9] Criminal Law ☞1440(2)
110k1440(2)
Rule requiring that fact-specific claims of ineffective assistance be raised in postconviction proceedings, rather than on direct appeal is prudential in nature. U.S.C.A. Const.Amend. 6.

[10] Criminal Law ☞1440(2)
110k1440(2)
Court of Appeals on direct review would not entertain claim that counsel were ineffective in not seeking new trials for defendants as alternative to motion for judgment of acquittal, as determination of whether decision was part of strategy or mere oversight required fact-finding by district court that was appropriately undertaken only on motion to vacate, correct or set aside. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2255.

[11] Criminal Law ☞1130(5)
110k1130(5)
Government waived claim that defendants' claims of error were precluded by choosing to address defendants' claims of error on merits in its main appellate brief, rather than arguing that claims were foreclosed by defendants' failure, as appellees, to pursue them during original appeal from judgment of acquittal.

[12] Criminal Law ☞1180
110k1180
In general, available claims of error not raised in an initial appeal may not be raised during subsequent appeals in the same case.

[13] Criminal Law ☞1136

[14] Criminal Law ☞1180
110k1180
Following reinstatement of guilty verdicts on initial appeal and denial of new trial on remand, defendants were not precluded on second appeal from raising claims of legal error which, if sustained, would lead only to a retrial, not to an acquittal by their failure to raise those claims, as appellees, on government's initial appeal from judgments of acquittal.

[15] Criminal Law ☞841
110k841
Objection to jury instruction during colloquy in pre-charge conference will not excuse non-compliance with rule requiring that objections to jury instruction be made after judge has charged jury but before jury retires to deliberate. Fed.Rules Cr.Proc.Rule 30(d), 18 U.S.C.A.

[16] Criminal Law ☞1038.1(2)
110k1038.1(2)
Review of jury instruction on which defendants did not preserve claims of error by timely objection was limited to plain error only. Fed.Rules Cr.Proc.Rule 30(d), 52(b), 18 U.S.C.A.

[17] Criminal Law ☞1030(1)
110k1030(1)
Under plain error review, appealing defendant must demonstrate: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.

[18] Banks and Banking ☞509.25
52k509.25
Omission of materiality requirement from instructions on "scheme to defraud" prong of bank fraud charge was not plain error where materiality of falsehoods inherent in defendants' scheme was evident under evidence; bank undoubtedly would not have approved loan had it known of defendants' deceptions regarding bank attorney's profit participation in loan and bank director's financial interest in loan as spouse of bank attorney. 18 U.S.C.A. § 1344(1, 2).

[19] Criminal Law ☞1175
110k1175

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

393 F.3d 1
(Cite as: 393 F.3d 1)

**Page 3**

When disjunctive theories are submitted to the jury and the jury renders a general verdict of guilty, the verdict should be affirmed as long as there is sufficient evidence to support one of the theories presented.

[20] Constitutional Law ☜═271
92k271
It does not offend due process to affirm a conviction even though one of several charged theories of guilt had an insufficient evidentiary predicate. U.S.C.A. Const.Amend. 5.

[21] Constitutional Law ☜═268(8)
92k268(8)

[21] Criminal Law ☜═720(7.1)
110k720(7.1)
Prosecution's mere argument in support of allegedly insufficient theory of guilt, which was fairly derived from record, did not violate due process, in case in which disjunctive theories of bank fraud were submitted to jury and jury returned general verdict. U.S.C.A. Const.Amend. 5.

[22] Banks and Banking ☜═509.25
52k509.25

[22] Constitutional Law ☜═268(8)
92k268(8)

[22] Criminal Law ☜═717
110k717
Inasmuch as bank board member had independent duty under banking regulations to advise other board members of undisclosed financial conflict of interest regarding bank loan to third parties, her husband's alleged disclosure to subordinate bank official of his financial interest in loan as bank attorney could not exculpate board member from liability for bank fraud, and thus prosecutorial argument to that effect was not misconduct in violation of due process, even if argument was somewhat ambiguous and was inapplicable to prosecution's other two theories supporting bank board member's guilt. U.S.C.A. Const.Amend. 5.

*3 Chauncey B. Wood, with whom Jean Larocque and Shea, Larocque & Wood were on brief, for appellant Nora F. Moran.

Francis J. DiMento, with whom Jason A. Kosow and DiMento & Sullivan were on brief, for appellant John M. Moran.

Christopher L. Varner, Assistant United States Attorney, with whom Michael J. *4 Sullivan, United States Attorney, was on brief, for appellee.

Before SELYA, Circuit Judge, STAHL, Senior Circuit Judge, and LYNCH, Circuit Judge.

SELYA, Circuit Judge.

This case is before us for a second time--but with the parties' roles reversed. In its first iteration, a panel of this court set aside the district court's entry of judgment n.o.v. for the defendants and reinstated guilty verdicts returned by the jury. *See United States v. Moran,* 312 F.3d 480 (1st Cir.2002) (*Moran 1* ). The district court subsequently declared untimely the defendants' belated efforts to secure a new trial and imposed sentence. The defendants now appeal.

This time around, we are asked to reconsider the original panel decision; to reverse the district court's determination that the defendants did not file a timeous motion for new trial; and to grant relief from the judgments of conviction on the ground that the defendants were burdened by ineffective assistance of counsel. In addition, the defendants advance, for the first time, claims of instructional error and prosecutorial misconduct. We reject outright the vast majority of these animadversions. As to the ineffective assistance claims, however, we find the record insufficient to rule definitively, and so dismiss those claims without prejudice to their renewal in proceedings under 28 U.S.C. § 2255.

I. BACKGROUND

We sketch the facts of the offenses of conviction, referring the reader who hungers for more exegetic detail to our earlier opinion. *See Moran I,* 312 F.3d at 482-87. Following the established praxis, we rehearse these facts in the light most compatible with the verdicts. *See, e.g., United States v. Hussein,* 351 F.3d 9, 11 (1st Cir.2003).

In October of 1986, John M. Moran, an attorney who represented, inter alios, First American Bank for Savings, met with Edgar Puente and David Boersner, aspiring real estate developers, who were seeking financing for a pair of projects in Boston, Massachusetts. The developers hired Mr. Moran as their mortgage broker and agreed to pay him 1.5% of the face amount of any loans that he procured on their behalf. Mr. Moran arranged a meeting between the developers and a First American loan officer, Edmund Noke, during which Noke agreed to lend Puente and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Boersner $17,000,000. Following this meeting, the developers agreed that Mr. Moran would receive a 20% profit interest in the two projects. His wife, Nora F. Moran--who sat on the board of directors of First American--created the Moran Development Group Trust (MDG Trust) to hold the equity interest and named herself sole trustee. Under state law, the identity of the beneficiaries of the MDG Trust was not a matter of public record.

In November of 1986, Mr. Moran submitted formal loan proposals to First American on behalf of Puente and Boersner. He disclosed neither his 20% profit interest nor his anticipated 1.5% brokerage fee, even though he was duty bound to do so. First American's executive committee approved the loans in December, and the bank designated Mr. Moran as its closing attorney. Mr. Moran conducted the closing, charged the bank handsomely for his services, and (unbeknownst to the bank) collected $255,000 from the developers. He never submitted the customary settlement sheets, which would have detailed the use of the loan proceeds (and, thus, would have revealed his conflicted interests).

*5 The record indicates that the Puente/Boersner loans were among 153 loans approved that month by the bank's executive committee. The committee considered those loans for approval in two groups. The first vote approved a block of 140 loans, and the second approved the remaining 13. The Puente/Boersner loans were part of the second (smaller) lot. The executive committee sent a report of its December activities to the bank's board of directors, but only provided details as to the first batch of loans.

In January 1987, the board of directors, including Mrs. Moran, met to consider the December report. The parties fiercely contest exactly what transpired at that meeting. The government's version, disputed by the defendants, is that Mrs. Moran voted either to ratify or approve the Puente/Boersner loans instead of disqualifying herself due to her and her husband's financial interests. Whatever happened that day, it is clear that Mrs. Moran never disclosed to First American the Morans' financial interests in the loans.

By 1988, the Puente/Boersner loans were underwater. Spurred by the prospect of a substantial loss, First American began an investigation that would eventually uncover the manifold irregularities surrounding the loans and the Morans' interests in them. In a meeting with First American's outside counsel, Mrs. Moran admitted that she knew about her husband's financial

stake at the time the loans were approved. For his part, Mr. Moran claimed that he had fully recounted his conflicted interests to Noke. The bank's records did not reflect any such disclosure.

Even though the Puente/Boersner loans eventually soured and the bank failed, the saga continued. On July 9, 1997, a federal grand jury indicted the Morans for, inter alia, committing bank fraud by failing to disclose their financial interests in the Puente/Boersner projects, 18 U.S.C. § 1344, aiding and abetting bank fraud, id. § 2, and conspiring to commit bank fraud, id. § 371. [FN1] Trial commenced on May 17, 1999. As to Mr. Moran, the government introduced evidence describing his fiduciary duties to the bank. It also adduced evidence showing that the paperwork he had submitted to First American did not disclose either the brokerage or profit-sharing arrangements. Finally, Noke testified that Mr. Moran never divulged his economic stake in the development projects and stated that such a revelation would have led to the filing of an insider transaction report. The government then showed that no such report appeared in the bank's archives.

> FN1. The indictment contained a second, unrelated count of bank fraud against Mrs. Moran. The district court granted her motion for judgment of acquittal as to that count at the close of the government's case in chief, Moran I, 312 F.3d at 485-86, and we eschew any further reference to it.

The government's case against Mrs. Moran was thinner. It did, however, introduce evidence limning her regulatory and fiduciary duties and showing that she was involved in various ways with the Puente/Boersner loans (e.g., she had visited the sites during a pre-loan inspection, had created the MDG Trust and named herself as trustee, and was generally privy to her husband's financial dealings). The government also proved that Mrs. Moran had failed to apprise her fellow board members about the Morans' financial interests in the Puente/Boersner projects. [FN2]

> FN2. As mentioned above, the government tried to show that, on January 15, 1987, Mrs. Moran had voted to ratify or approve the Puente/Boersner loans, instead of disqualifying herself from the vote. The Moran I panel did not rely on this evidence, see 312 F.3d at 492, and we do not dwell on it at this juncture.

*6 The defense moved for judgment of acquittal

following the close of the government's case in chief. Fed.R.Crim.P. 29(a). The district court denied the motions. During the defense case, Mr. Moran testified that he had made full disclosure to Noke. Mrs. Moran did not testify. The government presented one rebuttal witness. At the close of all the evidence, the defense again moved for judgment of acquittal. The district court reserved decision, Fed.R.Crim.P. 29(b), and the jury found the defendants guilty on all the submitted counts.

The verdicts were recorded on July 14, 1999, and judgment entered on that date. The next day, the Morans filed a renewed motion for judgment of acquittal. *See* Fed.R.Crim.P. 29(c). The district court granted the Morans an extension of time within which to file supplemental memoranda. On September 15, each defendant filed a supplemental memorandum that asked the court, among other things, to treat the joint July 15 motion, in the alternative, as a motion for new trial under Fed.R.Crim.P. 33. The government opposed both the motion for judgment of acquittal and the requests for conversion. The district court pondered the matter at length. [FN3] On July 13, 2000, it granted the motion for judgment of acquittal without addressing the conversion requests.

> FN3. In October of 1999, the defendants jointly filed a separate motion for a new trial based on newly discovered evidence (specifically, alleged juror misconduct). That motion was timely. *See* Fed.R.Crim.P. 33(b)(1). However, the district court denied it on December 27, 1999. On appeal, the defendants do not attempt to challenge that ruling.

The government appealed from this ruling. We reversed. *Moran I,* 312 F.3d at 494. As to Mr. Moran, we found ample evidence to support the verdict: he had a plain duty to disclose his sharply conflicted financial interests to the bank, and his testimony that he had made the disclosure allowed the jury, based on credibility and demeanor, to disbelieve him and credit Noke's contrary testimony. *Id.* at 490-91. To buttress that permissible finding, the record supported the conclusion that Mr. Moran intentionally failed to disclose the information in order to gain a financial advantage. *Id.* at 491. "In sum, there was sufficient evidence to allow a rational jury to conclude, beyond a reasonable doubt, that ... Moran concealed his financial arrangements with Puente and Boersner ... pursuant to an affirmative endeavor calculated to defraud First American." *Id.* at 491-92.

As to Mrs. Moran, we found that although the government's theory that she had voted to ratify or approve the Puente/Boersner loans did not pass muster, *see supra* note 2, there were other, independently sufficient grounds for upholding the verdict. *Id.* at 492. Specifically, the government had presented adequate evidence to allow a rational jury to conclude that Mrs. Moran, "aware of her husband's outside dealings and arrangements concerning the projects prior to the consummation of the transactions at issue, chose not to disclose the conflicts ... because she anticipated that a financial windfall would accrue to her husband (and by extension to her) should the loans be approved." *Id.* We also discerned significant evidence that Mrs. Moran had aided and abetted her husband's scheme: she accompanied her husband on an inspection of the properties before the loan applications were submitted; she created the MDG Trust two days before the bank's executive committee approved the loans; and she named herself as trustee instead of Mr. *7 Moran's secretary (as was their custom). *Id.* We also observed that Mrs. Moran regularly shared financial matters with her husband and that she was, in her own right, "an astute real estate broker and bank director familiar with the affirmative duties of disclosure." *Id.* at 492. Taken as a whole, this evidence sufficed for a rational jury to convict Mrs. Moran of both bank fraud and conspiracy. *Id.* at 493-94. Chief Judge Boudin joined in the reinstatement of the convictions but wrote separately to suggest that the thinness of the evidence against Mrs. Moran probably would support an order granting her a new trial if the district court found that she had timely sought that anodyne. *Id.* at 495-96 (Boudin, C.J., concurring).

On remand, the Morans moved for a hearing on their outstanding requests to convert their Rule 29 motion into a Rule 33 motion. The government filed an opposition. The district court rebuffed the conversion requests, ruling that the defendants had not seasonably moved for a new trial. The court proceeded to pronounce sentence. These timely appeals followed.

II. ANALYSIS

We divide our analysis into several discrete segments, corresponding with the variety of the defendants' arguments.

A. *Law of the Case.*

We start with Mrs. Moran's explicit beseechment that we revisit and repudiate the prior panel opinion. The government counters that we are without the power to

conduct such a review under the law of the case doctrine and that, in all events, the predecessor panel got it right. We give each side half a loaf. On the one hand, we agree with Mrs. Moran that, as a theoretical matter, we have some authority--albeit limited authority--to reexamine our earlier decision. On the other hand, we agree with the government that the circumstances at hand do not warrant displacing the earlier ruling.

[1][2] The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). The doctrine has two branches--the first branch--the mandate rule--prevents relitigation in the trial court of matters that were explicitly or implicitly decided by an earlier appellate decision in the same case. *United States v. Vigneau,* 337 F.3d 62, 67 (1st Cir.2003). The second branch contemplates that a legal decision made at one stage of a criminal or civil proceeding should remain the law of that case throughout the litigation, unless and until the decision is modified or overruled by a higher court. *See Christianson v. Colt Indus. Oper'g Corp.,* 486 U.S. 800, 816-17, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). That branch binds, for example, a successor appellate panel in a second appeal in the same case, *see Cohen v. Brown Univ.,* 101 F.3d 155, 167-68 (1st Cir.1996), and a successor trial judge who steps in to complete a pending case, *see Flibotte v. Pa. Truck Lines, Inc.,* 131 F.3d 21, 24-25 (1st Cir.1997).

We are dealing here with the second branch of the law of the case doctrine. That branch is prudential and, accordingly, is more flexible than the first. We recently catalogued several situations in which a court might appropriately reconsider its past decision. *See Ellis v. United States,* 313 F.3d 636, 647-48 (1st Cir.2002). Mrs. Moran asseverates that this case comes within that taxonomy as a case in which "reconsideration may be appropriate to avoid manifest injustice." *Id.* at 648.

*8 [3] While *Ellis* recognized this exception--and we reaffirm its vitality--a litigant seeking to fit within its confines must negotiate a steep uphill climb. In this context, a finding of manifest injustice requires, at a bare minimum, "a definite and firm conviction that a prior ruling on a material matter is unreasonable or obviously wrong," and resulted in prejudice. *Id.* at 648 & n. 5. Mrs. Moran cannot scale these heights.

[4] In mounting her argument, Mrs. Moran relies

exclusively on Chief Judge Boudin's concurring opinion in *Moran I.* What she seemingly fails to appreciate is that even the author of that concurrence concluded that there was sufficient evidence upon which to ground a conviction. *Moran I,* 312 F.3d at 495-96 (Boudin, C.J., concurring). That conclusion is antithetic to Mrs. Moran's claim that the concurrence necessitates (or even supports) a finding that the earlier panel opinion was, in the *Ellis* phrase, "unreasonable or obviously wrong." *Ellis,* 313 F.3d at 648. Since Mrs. Moran points to no other authority to support such a finding, there is no basis for suspecting manifest injustice here. We therefore decline Mrs. Moran's invitation to disturb the decision in *Moran I.*

### B. The Attempted Conversion.

A motion for a new trial in a federal criminal case, other than a motion alleging newly discovered evidence, must be filed within seven days next following the initial entry of judgment. Fed.R.Crim.P. 33(b)(2). Mr. Moran filed no such motion within the allotted interval. In an endeavor to repair this omission, he asseverates that the defendants' timely motion for judgment of acquittal should have been considered "alternatively" as a motion for new trial and that, therefore, the district court should have converted that Rule 29 motion into a Rule 33 motion for a new trial. [FN4] This asseveration is hopeless.

> FN4. Although the Morans jointly filed the motion for judgment of acquittal, Mrs. Moran does not pursue this line of argument.

The motion to which Mr. Moran alludes was captioned "Motion[ ] for Judgment of Acquittal and for Additional Time to File Memoranda." The body of the motion reads in relevant part:

> NOW COME defendants John and Nora Moran, through counsel, and pursuant to Rule 29 of the Federal Rules of Criminal Procedure and hereby renew their motions for this Honorable Court to enter a judgment of acquittal as to all counts of the Superseding Indictment. In support thereof, counsel states the following:
>
> ...
>
> 6.... [T]he government failed to offer sufficient evidence upon which a rational jury could find the Defendants guilty beyond a reasonable doubt of the crimes of bank fraud and conspiracy to commit bank fraud.
>
> 7. The government's evidence is equally consistent with guilt as it is with innocence which requires a judgment of acquittal.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8. Assuming *arguendo* that the government established that the Defendants violated bank policy and/or civil banking regulations, the government failed to introduce any other conduct which may form the basis for a bank fraud conviction.

9. The government has failed to prove intent on the part of the Defendants.

*9 10. Assuming *arguendo* that the government has proven that the Defendants intended to defraud First American Bank, it failed to prove that their statements or omissions were material.

WHEREFORE, based upon the foregoing arguing [sic] arguments and authorities this Honorable Court is respectfully urged to permit the Defendants additional time to file memoranda in support of the instant motion and to enter a judgment of acquittal as to all counts of the Superseding Indictment.

Mr. Moran suggests that this motion was sufficient to permit a judge to grant him a new trial based on the following syllogism: (i) the substance of a motion, not its title, controls; (ii) a motion pointing out that the government did not have enough evidence to convict a defendant, a priori, supports a claim that the weight of the evidence tipped greatly in the defendant's favor; (iii) such a weight-of-the-evidence finding would support the granting of a new trial; and so (iv) a motion seeking judgment of acquittal because of insufficient evidence--like Mr. Moran's motion--"logically" must encompass a request for a new trial.

Taken in the abstract, some of these premises are correct. For example, we have stated that "[i]n addressing a post-judgment motion, a court is not bound by the label that the movant fastens to it" and may "reclassify the motion as its substance suggests." *Vasapolli v. Rostoff,* 39 F.3d 27, 36 (1st Cir.1994). So too a timely motion for new trial may be granted when "evidence preponderates heavily against the verdict." *United States v. Wilkerson,* 251 F.3d 273, 278 (1st Cir.2001) (internal quotation marks omitted). But two swallows do not a summer make, and Mr. Moran's syllogism falls apart when one analyzes its conclusion: that a motion seeking a judgment of acquittal on sufficiency-of-the-evidence grounds necessarily must be read as requesting a consolation prize in the nature of a new trial.

[5][6] That reading is neither logically compelled nor legally appropriate. Where the motion papers cannot be fairly construed as a request for a new trial, a district court does not have the authority, sua sponte, to convert a motion for judgment of acquittal into a

motion for a new trial. *United States v. Navarro Viayra,* 365 F.3d 790, 793 (9th Cir.2004); *United States v. Brown,* 587 F.2d 187, 189 (5th Cir.1979). That choice is the defendant's--and the defendant's alone. What is more, it must be exercised within the time parameters prescribed by the Criminal Rules.

As said, Fed.R.Crim.P. 33(b)(2) specifies that a motion for new trial, other than a motion grounded on newly discovered evidence, must be filed within seven days of the jury verdict (i.e., the entry of judgment). That rule was amended in 1966 to "make it clear that a judge has no power to order a new trial on his own motion" once judgment has entered. Fed.R.Crim.P. 33 advisory committee notes (1966 Amendments). Simultaneously, the advisory committee made it pellucid that the Criminal Rules forbid an interpretation that would allow a district court, on its own initiative, to evade the temporal strictures of Rule 33 by reading into a Rule 29 motion for judgment of acquittal a request for a new trial, not solicited by the movant. *See* Fed.R.Crim.P. 29 advisory committee notes (1966 Amendments, Subdivision (c)) (explaining that Rule 29(c) precludes an interpretation that "gives the [district] court power to order a new trial even though the defendant ... has not asked for one").

[7] Viewed against this backdrop, it is transparently clear that even if a motion for judgment of acquittal contains a substantive basis sufficient to ground the *10 grant of a new trial, a court is without power to treat the motion as a motion for a new trial unless it also contains some overt indication that the movant desires that relief. The motion in this case contained no such indication. It invoked Rule 29, not Rule 33, and the only relief requested was an outright acquittal. It was not until September 15, 1999--well beyond the seven-day deadline--that Mr. Moran informed the district court of his desire for a new trial. That was too late. [FN5]

FN5. Mr. Moran's citation to *United States v. Baker,* 432 F.2d 994 (10th Cir.1970) (per curiam), is of little value. *Baker* states, without analysis, that the motion for judgment of acquittal filed by the defendant in that case "should be construed as containing allegations sufficient to constitute a motion for new trial." *Id.* at 995. The court neither described the contents of the motion nor explained what relief the defendant had sought. To the extent that *Baker* suggests that a district court can grant a new trial sua sponte after the entry of judgment in a criminal case, without a timely indication from the defendant that he desires one, its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

holding is flatly inconsistent with the Criminal Rules and, like the Ninth Circuit, *see Navarro Viayra,* 365 F.3d at 795, we respectfully decline to follow it.

That disposes of this assignment of error. The Criminal Rules gave Mr. Moran seven days within which to move for a new trial. He failed to seek that relief, and his timely motion for judgment of acquittal did not fill the void. Consequently, the district court acted appropriately both in denying Mr. Moran's belated conversion request and in refusing to grant a new trial.

### C. *Ineffective Assistance of Counsel.*

The defendants next claim that the failure of their trial attorneys to file timely new trial motions constitutes ineffective assistance of counsel and, as such, justifies retrial. This claim, raised for the first time in this venue, is premature.

[8][9] "We have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court." *United States v. Mala,* 7 F.3d 1058, 1063 (1st Cir.1993) (collecting cases). This rule is prudential in nature. A claim of ineffective assistance requires a showing that the attorney turned in a constitutionally deficient performance that prejudiced the defendant's substantial rights. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Martinez-Vargas,* 321 F.3d 245, 251 (1st Cir.2003). Claims of this sort "typically require the resolution of factual issues that cannot efficaciously be addressed in the first instance by an appellate tribunal." *Mala,* 7 F.3d at 1063. In addition, the insights of the trier, who has seen and heard the witnesses at first hand and watched the dynamics of the trial unfold, are often of great assistance. *See, e.g., United States v. Fish,* 34 F.3d 488, 494 n. 4 (7th Cir.1994); *United States v. McGill,* 952 F.2d 16, 19 (1st Cir.1991).

[10] This is such a case. No ineffective assistance claim surfaced in the district court, and the record is barren of evidence as to why the lawyers did what they did. There are both tactical and strategic reasons why a party might seek a judgment of acquittal but not a new trial (for example, a fear that the prosecution will learn from its mistakes and put in a more persuasive case the second time around, a fear that the decisionmaker will take a request for acquittal less seriously if a possible

compromise--such as a new trial--is on the table, or a fear that a shift in judges will lead to a stiffer sentence). Although hindsight is always 20/20, we cannot tell from this record whether the decision not to seek a new trial, *when made,* *11 was a calculated stratagem or a mere oversight. Factfinding will be required to make that determination, which means that the district court should hear the claim in the first instance. *See, e.g., McGill,* 952 F.2d at 19.

We add, moreover, that even if the failure to ask for a new trial betokens objectively unreasonable (and, therefore, constitutionally deficient) performance on the part of the lawyers--a matter on which we take no view--it remains to be determined whether any such failure was prejudicial within the meaning of *Strickland.* A finding of prejudice here would require a subsidiary finding that, but for the error, the moving defendant probably would have received a new trial. *See, e.g., Flores v. Demskie,* 215 F.3d 293, 305 (2d Cir.2000). That question is not open and shut. Each defendant must independently demonstrate that, given the holding of this court in *Moran I,* an objectively reasonable district court would likely have granted a new trial. [FN6] *See Butcher v. United States,* 368 F.3d 1290, 1294-95 (11th Cir.2004); *Ouber v. Guarino,* 293 F.3d 19, 32-33, 33 n. 10 (1st Cir.2002). The nisi prius court is the proper forum in which the defendants may attempt to make this showing.

> FN6. The fact that the district court originally granted the defendants' motion for judgment of acquittal is not an infallible harbinger of how motions for new trial would fare. The district court's judgment, informed by the opinion in *Moran I,* may well be different. In any event, no less an authority than the Supreme Court has stated that in the ineffective assistance context, "the idiosyncracies of the particular decisionmaker ... are irrelevant to the prejudice inquiry." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052.

For these reasons, we decline to entertain the ineffective assistance claims here and now. Instead, we dismiss them without prejudice to their reassertion, should the defendants so choose, in proceedings under 28 U.S.C. § 2255.

### D. *Miscellaneous Assignments of Error.*

There are two other issues lurking at the periphery of these appeals: both defendants argue that the district court incorrectly instructed the jury on the bank fraud count and Mrs. Moran urges that the prosecutors' summation misstated both the facts and the law. Before

addressing these issues, we turn to a threshold question: are these claims of error foreclosed by the defendants' failure, as appellees, to pursue them during the original appeal (*Moran I* )?

[11] 1. *Preclusion.* We begin our discussion on a cautionary note: the government did not make a preclusion argument in its main appellate brief, but, rather, frontally addressed the substance of the Morans' assignments of error. We recognize the possibility of preclusion during oral argument and requested supplemental briefing on the point. The government, in its supplemental brief, has argued for preclusion--but its failure to raise the preclusion issue in a timely manner is reason enough to deem it waived. *See United States v. Rodriguez-Marrero,* 390 F.3d 1 (1st Cir.2004); *United States v. Caraballo-Cruz,* 52 F.3d 390, 393 (1st Cir.1995).

To be sure, we have discretion, in the interests of justice, to overlook this kind of waiver--a lack of developed argumentation--by the government in a criminal case. *See, e.g., United States v. Rose,* 104 F.3d 1408, 1414 (1st Cir.1997). Even were we prone to exercise that discretion here, it would not profit the government. We explain briefly.

[12][13] In general, *available* claims of error not raised in an initial appeal may not be raised during subsequent appeals in the same case. *See United States v. *12 Abreu-Cabrera,* 94 F.3d 47, 49 (2d Cir.1996) (explaining that "appellate courts will refuse to consider trial court rulings that could have been raised on an earlier appeal"); *see also United States v. Ticchiarelli,* 171 F.3d 24, 28-29 (1st Cir.1999). Here, however, the Morans were *appellees* during the first appeal. That juxtaposition may make a material difference where, as here, the judgment from which an appeal is taken is entirely favorable to the appellee and that party, after losing the appeal, then seeks to raise a new issue during a later appeal of an unfavorable judgment. *See, e.g., Laitram Corp. v. NEC Corp.,* 115 F.3d 947, 954 (Fed.Cir.1997); *Crocker v. Piedmont Aviation, Inc.,* 49 F.3d 735, 740- 41 (D.C.Cir.1995). Absent a cross-appeal, an appellee can only raise arguments in support of the judgment during the course of an appeal. *United States v. Am. Ry. Express Co.,* 265 U.S. 425, 435-36, 44 S.Ct. 560, 68 L.Ed. 1087 (1924); *Martin v. Tango's Restaurant, Inc.,* 969 F.2d 1319, 1325 (1st Cir.1992). A cross-appeal normally is improper when taken by a defendant from a favorable judgment, *Field v. Mans,* 157 F.3d 35, 41 (1st Cir.1998), and arguably impermissible when taken by a defendant from a judgment of acquittal in a criminal

case. *See United States v. Boyd,* 958 F.2d 247, 250 (8th Cir.1992); *United States v. Williams,* 679 F.2d 504, 507 (5th Cir.1982).

[14] Given these authorities, we need not decide definitively whether a cross-appeal might have been permitted in connection with the government's earlier appeal of the judgments of acquittal. When an appellee fails to contest a point that is irrelevant unless the main appeal results in reversal or remand, this court, even if a cross-appeal theoretically might have been possible, has been reluctant to find preclusion. *See Field,* 157 F.3d at 41- 42 (abjuring preclusion based solely on a failure to file a "procedurally dubious cross-appeal" relating to what "might [originally] have seemed an entirely redundant point").

Let us be perfectly clear. There are times when even an appellee who is defending an entirely favorable judgment must either raise an error purportedly committed by the district court or waive it. Typically, however, this occurs when correction of the error would provide either an alternate or an additional basis for affirmance of a favorable judgment. *See, e.g., Schering Corp. v. Ill. Antibiotics Co.,* 89 F.3d 357, 358-59 (7th Cir.1996). That is not the situation here: the defendants' newly asserted assignments of error--an ostensible flaw in the jury instructions and allegations of prosecutorial misconduct--are claims of legal error which, if sustained, would lead only to a retrial, not to an acquittal. Thus, even apart from the government's waiver, we would likely deem the defendants free to raise the assigned errors for the first time in this proceeding.

2. *Jury Instructions.* We turn next to the jury instructions. The defendants contend that the district court improperly charged the jury on the elements of bank fraud. We examine that contention.

The federal bank fraud statute provides in pertinent part:

Whoever knowingly executes, or attempts to execute, a scheme or artifice--
(1) to defraud a financial institution; or
(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
shall be [punished as provided].

18 U.S.C. § 1344. The Supreme Court has glossed this language, stating that any *13 scheme to defraud a financial institution must "employ material

falsehoods." *Neder v. United States,* 527 U.S. 1, 20, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (emphasis omitted).

In this case, the lower court instructed the jury, without objection, that it could base a guilty verdict on either subsection (1) or (2), and then explicated each subsection. With regard to section 1344(1), the court defined a scheme to defraud without specifying that the prevarications embodied in the scheme had to be materially false. The court did, however, indicate the necessity of finding material falsehood with regard to section 1344(2)'s "obtaining money by false pretenses" prong.

[15][16] During oral argument in this court, the government conceded that the district court's section 1344(1) instruction was erroneous for this reason. *See United States v. Benjamin,* 252 F.3d 1, 6 (1st Cir.2001) ; *United States v. Colon-Munoz,* 192 F.3d 210, 221 (1st Cir.1999). It pointed out, however, that neither of the defendants had objected to the instruction during the time frame specified in Fed.R.Crim.P. 30(d) (requiring that objections to jury instructions be made after the judge has charged the jury, but before the jury retires to deliberate). [FN7] Under these circumstances, our review is limited to plain error. *See* Fed.R.Crim.P. 30(d), 52(b); *see also United States v. Olano,* 507 U.S. 725, 731-32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

> FN7. Mrs. Moran tries to talk around the problem, insisting that her attorney quibbled with the trial court as to the materiality instruction during the pre-charge conference. Such a pre-charge colloquy is insufficient to satisfy the requirements of Rule 30(d). *See United States v. Coady,* 809 F.2d 119, 123 (1st Cir.1987) (stating that though "counsel may have discoursed upon the nature of his theory at some time prior to the giving of the charge," that circumstance "will not excuse noncompliance with the express mandates of Rule 30"); *see also United States v. Arthurs,* 73 F.3d 444, 448 (1st Cir.1996).

[17] A party undertaking the rigors of plain error review must carry a heavy burden. Under that regime, an appealing defendant must demonstrate: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *United States v. Duarte,* 246 F.3d 56, 60 (1st Cir.2001) . Even then, the reviewing court may, but is not

required to, rectify the situation. *Olano,* 507 U.S. at 735-36, 113 S.Ct. 1770. The net result is that plain error review tends to afford relief to appellants only for "blockbuster[ ]" errors. *United States v. Griffin,* 818 F.2d 97, 100 (1st Cir.1987).

[18] In this instance, the first two prongs of the test are satisfied. The defendants stumble, however, over the third prong. The assigned error did not affect their substantial rights: the defendants do not and cannot show that the inclusion of an additional materiality instruction had any effect at all on the trial or its outcome.

"Materiality" requires only that a false or omitted statement have "a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder,* 527 U.S. at 16, 119 S.Ct. 1827 (brackets and internal quotation marks omitted). This court already has noted that the materiality of the falsehoods inherent in the defendants' scheme to defraud was evident. *See Moran I,* 312 F.3d at 491 & n. 13 (concluding that the bank might well have acted differently had it known of the defendants' interests); *see also id.* at 496 (Boudin, C.J., concurring) (finding "unpersuasive" Mrs. Moran's non-materiality argument). *14 On the basis of this record, there is simply no justification for upsetting the verdict on this ground. *See Neder,* 527 U.S. at 19-20, 119 S.Ct. 1827 (holding failure to instruct on materiality harmless when record contains no "evidence that could rationally lead" to a contrary finding); *United States v. Blastos,* 258 F.3d 25, 29 (1st Cir.2001) (same).

3. *The Summation.* The prosecution's closing argument was given by two individuals and in two parts, bracketing the defendants' summations. Mrs. Moran asserts that this bifurcated closing argument so tainted the trial as to deny her due process. This assertion rests on four separate statements attributable to members of the prosecution team.

Mrs. Moran maintains that the first two statements misstated the facts. During the initial phase of his summation, one prosecutor said:

> If you go to Exhibit number 43, minutes of the Board of Directors, January of '87, Nora Moran is present. It talks about how the activities of the Executive Committee are brought up for presentation and the summarization by Mr. Murray. There was testimony they would be summarized, the individual loans might be talked about, they would be brought forth for review and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

approval. And the records affirmatively show Nora Moran was there that day. She voted in favor of the loan, her loan, involving Puente and Boersner and their finances and made no dissent, no abstention, no disclosure.

Another prosecutor made essentially the same comment during the rebuttal phase of the summation. We treat these two statements together. Inasmuch as the defense did not interpose a contemporaneous objection on either occasion, we review only for plain error. *See Griffin,* 818 F.2d at 99-100.

We discern no plain error. The evidence supported a reasonable inference that First American's board of directors voted on the Puente/Boersner loans. The evidence showed that the executive committee approved the loans in December; that the committee's custom and practice was to transmit a complete list of its approved loans to the board; that the board typically would consider, and vote on, the approved loans at the next month's board meeting; and that Mrs. Moran attended that meeting (held in January of 1987). No more was exigible to allow the argument to be proffered.

Mrs. Moran suggests that these statements were improper based on the observations subsequently made by the district court in support of its entry of judgment of acquittal. In that decision, the court opined that, even had Mrs. Moran voted on the Puente/Boersner loans, the most that could be said was that she had voted to accept a summary report rather than to ratify or approve those particular loans (as the bank, by the time of the vote, already had committed, and largely disbursed, the funds).

Mrs. Moran's suggestion is a non-sequitur. At the close of the evidence, the court allowed the case to go to the jury on a primary theory of liability having two strains--a voting theory and a non-disclosure theory--and a less prominent aiding and abetting theory. *Moran I,* 312 F.3d at 492 & n. 14. This court found the voting theory insufficiently proven, but found the evidence adequate to support the verdict on both the non-disclosure theory and the aiding and abetting theory. *Id.* at 492-93. Given this posture of the case, Mrs. Moran's challenge lacks bite.

[19][20][21] It is common ground that when "disjunctive theories are submitted to the jury and the jury renders a general *15 verdict of guilty ... as long as there was sufficient evidence to support one of the theories presented, then the verdict should be affirmed." *United States v. Garcia,* 992 F.2d 409, 416

(2d Cir.1993) (citing *Griffin v. United States,* 502 U.S. 46, 49-51, 55-60, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)). If it does not offend due process to affirm a conviction even though one of several charged theories of guilt had an insufficient evidentiary predicate, *see Griffin,* 502 U.S. at 51, 112 S.Ct. 466; *United States v. Nieves-Burgos,* 62 F.3d 431, 434-36 (1st Cir.1995), a fortiori, mere argument in support of that insufficient theory, fairly derived from the record, cannot violate due process. To hold otherwise would eviscerate the *Griffin* doctrine.

[22] Mrs. Moran fares no better on the other aspect of her prosecutorial misconduct claim. This involves her insistence that the prosecutors twice misstated the law (once during the initial phase of the summation and again during the rebuttal phase) when it was said, in effect, that Mr. Moran could not make any legally exculpatory disclosures on behalf of his wife. Here, too, neither statement drew a contemporaneous objection, so appellate review is limited to plain error. *See Griffin,* 818 F.2d at 99-100.

In order to prevail under the four-part plain error regime, *see Duarte,* 246 F.3d at 60, Mrs. Moran's first obligation is to show that the prosecutors' statements were legally flawed. She has failed to make that showing.

As said, there were three routes to finding that Mrs. Moran possessed the scienter necessary to have committed bank fraud. The voting theory implicated banking regulations, uniquely applicable to Mrs. Moran in her capacity as a director of the bank, which required her to inform her fellow directors about any loans in which she had a financial interest and to disqualify herself from voting on them. The non-disclosure theory implicated Mrs. Moran's duty, as the bank's fiduciary, to report her husband's double-dealing. The aiding and abetting theory implicated her knowing assistance to her husband's fraud. Under the latter two theories, Mrs. Moran's criminal intent was premised on knowledge that her husband had breached *his* ethical duties to the bank. This was what attracted Chief Judge Boudin's concern. *See Moran I,* 312 F.3d at 494-95 (Boudin, C.J., concurring).

This segmentation is critical to our disposition of this aspect of Mrs. Moran's prosecutorial misconduct claim, for the context of the challenged statements makes it clear that they referred to her personal obligation under the voting theory. The prosecutor was arguing, in effect, that Mrs. Moran's obligation to the board of directors could not be deemed satisfied by her

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

393 F.3d 1
(Cite as: 393 F.3d 1, *15)

**Page 12**

husband's alleged disclosure to Noke. This argument restated competent testimony that such a disclosure was insufficient because Noke was a subordinate employee of the bank, not a fellow director. Viewed in this light, the challenged statements can be read as positing that even if Mr. Moran had fulfilled his ethical duty, Mrs. Moran knew that she had an independent, supervening duty to First American's board and nonetheless voted on the loans with full awareness that she had not satisfied that duty. We believe that was within the ambit of permissible advocacy.

The worst that can be said is that this strain of argument was ambiguous; it was legally accurate as to one of the prosecution's theories of guilt, arguably inaccurate as to the others, and did not clearly differentiate among them. But context is important, and both times the prosecutor made the challenged statement, it served as the starting point of a discussion of the *16 voting theory. We do "not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *United States v. Lilly,* 983 F.2d 300, 307 (1st Cir.1992) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). We make no such inference here. Considering the context of the statements and the fact that no contemporaneous objection was lodged, we must give the prosecutor the benefit of the doubt. *See United States v. Taylor,* 54 F.3d 967, 979 (1st Cir.1995); *Lilly,* 983 F.2d at 307.

If more were needed--and we doubt that it is--we are satisfied that the judge's charge dispelled any possible confusion. The charge clearly differentiated among the government's three theories. It identified how the regulatory duties of Mrs. Moran, as a director, differed from the general fiduciary duties owed by both defendants, and limned the contours of the aiding and abetting theory. To cinch matters, the court explicitly instructed that "if what [the attorneys] have said about the law seems to ... have a different meaning in any way from my instructions on the law, you must be guided only by my instructions." Under these circumstances, we are confident that any prejudice stemming from the challenged statements did not survive the court's charge. There was, therefore, no plain error. *See Taylor,* 54 F.3d at 977.

### III. CONCLUSION

We need go no further. For the reasons elucidated above, we affirm the convictions and sentences of both defendants. In so doing, however, we do not adjudicate the merits of the defendants' ineffective assistance of counsel claims. Those claims are dismissed without prejudice and may be resurrected, should either or both of the defendants so elect, in post-conviction proceedings under 28 U.S.C. § 2255. *See Mala,* 7 F.3d at 1064.

*Affirmed.*

393 F.3d 1

Briefs and Other Related Documents (Back to top)

.            03-2149         (Docket) (Aug. 21, 2003)

.            03-2148         (Docket) (Aug. 21, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Copyright 2005 by Reed Elsevier Inc.
MARTINDALE-HUBBELL (R) LAW DIRECTORY

Practice Profiles Section

FRANCIS  J.  DIMENTO
DiMento & Sullivan
7 Faneuil Hall Market Place
Boston, Massachusetts
(Suffolk County)

RATING: AV

POSITION: Member

ADMITTED: 1951

LAW-SCHOOL: Harvard University (LL.B.)

COLLEGE: Harvard University (A.B.)

BORN: 1927

ISLN: 907845773

Citations List
Database: ALLFEDS

1. Sanabria v. U. S., 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (U.S.Mass. Jun 14, 1978) (NO. 76-1040)

2. Patriarca v. U.S., 393 U.S. 1022, 89 S.Ct. 633 (Mem), 21 L.Ed.2d 567 (U.S.Mass. Jan 13, 1969) (NO. 725)

3. Piccioli v. U.S., 390 U.S. 202, 88 S.Ct. 899 (Mem), 19 L.Ed.2d 1034, 68-1 USTC P 15,820 (U.S.Conn. Mar 04, 1968) (NO. 4, OCT. TERM 1967)

4. Sagansky v. U.S., 385 U.S. 816, 87 S.Ct. 36 (Mem), 17 L.Ed.2d 55 (U.S.Mass. Oct 10, 1966) (NO. 131)

5. Laplaca v. U.S., 383 U.S. 927, 86 S.Ct. 932 (Mem), 15 L.Ed.2d 846 (U.S.Mass. Feb 28, 1966) (NO. 911)

6. Callahan v. Moneta Capital Corp., 2005 WL 1524114 (1st Cir.(R.I.) Jun 29, 2005) (NO. 04-1950, 04-1951)

7. U.S. v. Moran, 393 F.3d 1 (1st Cir.(Mass.) Dec 15, 2004) (NO. 03-2148, 03-2149)

8. U.S. v. Cronin, 62 Fed.Appx. 369, 2003 WL 21094553 (1st Cir.(Mass.)) (Not selected for publication in the Federal Reporter) (1st Cir.(Mass.) May 14, 2003) (NO. 02-2240)

9. U.S. v. Moran, 312 F.3d 480 (1st Cir.(Mass.) Sep 23, 2002) (NO. 00-2097)

10. U.S. v. Tierney, 266 F.3d 37 (1st Cir.(Mass.) Oct 02, 2001) (NO. 00-1680)

11. U.S. v. Scungio, 255 F.3d 11 (1st Cir.(R.I.) Jul 06, 2001) (NO. 00-2229)

12. U.S. v. Leppo, 177 F.3d 93 (1st Cir.(Mass.) May 27, 1999) (NO. 98-1604)

13. Adelson v. DiPaola, 131 F.3d 259 (1st Cir.(Mass.) Dec 12, 1997) (NO. 97-1536)

14. U.S. v. Kayne, 90 F.3d 7, 45 Fed. R. Evid. Serv. 120 (1st Cir.(Mass.) Jul 24, 1996) (NO. 94-1406, 94-1407)

15. U.S. v. DiIanni, 87 F.3d 15 (1st Cir.(Mass.) Jun 24, 1996) (NO. 95-1524)

16. In re Grand Jury Proceedings, 859 F.2d 1021 (1st Cir.(Mass.) Oct 11, 1988) (NO. 88-1604)

17. U.S. v. Angiulo, 847 F.2d 956, 56 USLW 2735, 26 Fed. R. Evid. Serv. 515 (1st Cir.(Mass.) May 24, 1988)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Citations List
Database: ALLFEDS

(NO. 86-1965, 86-2000, 86-2017, 87-1745)

18. U.S. v. Cintolo, 818 F.2d 980 (1st Cir.(Mass.) May 01, 1987) (NO. 85-1615)

19. U.S. v. Johnston, 784 F.2d 416, 20 Fed. R. Evid. Serv. 434 (1st Cir.(Mass.) Feb 20, 1986) (NO. 85-1268, 85-1269, 85-1281)

20. U.S. v. Norton, 755 F.2d 1428 (11th Cir.(Fla.) Mar 22, 1985) (NO. 83-3410)

21. U.S. v. Sorrentino, 726 F.2d 876, 53 A.F.T.R.2d 84-799, 84-1 USTC P 9196, 15 Fed. R. Evid. Serv. 194 (1st Cir.(Mass.) Jan 31, 1984) (NO. 83-1260)

22. U.S. v. Tracey, 675 F.2d 433, 49 A.F.T.R.2d 82-1392, 82-1 USTC P 9325, 10 Fed. R. Evid. Serv. 677 (1st Cir.(Mass.) Apr 15, 1982) (NO. 81-1367, 82-1086)

23. Reinstein v. Superior Court Dept. of Trial Court of Massachusetts, 661 F.2d 255 (1st Cir.(Mass.) Sep 30, 1981) (NO. 81-1050)

24. U.S. v. Poutre, 646 F.2d 685, 52 A.F.T.R.2d 83-5203 (1st Cir.(Mass.) Dec 31, 1980) (NO. 79-1193)

25. In re Poutre, 602 F.2d 1004 (1st Cir.(Mass.) Jul 17, 1979) (NO. 79-1199)

26. U.S. v. Irwin, 593 F.2d 138, 79-1 USTC P 9222 (1st Cir.(Mass.) Feb 21, 1979) (NO. 78-1394)

27. U.S. v. Romano, 583 F.2d 1 (1st Cir.(Mass.) Aug 11, 1978) (NO. 78-1046)

28. U.S. v. DiCarlo, 575 F.2d 952 (1st Cir.(Mass.) Apr 20, 1978) (NO. 78-1026)

29. U.S. v. DiCarlo, 565 F.2d 802 (1st Cir.(Mass.) Nov 11, 1977) (NO. 77-1165, 77-1166)

30. U.S. v. Plotkin, 550 F.2d 693 (1st Cir.(Mass.) Mar 04, 1977) (NO. 76-1012, 76-1013, 76-1014, 76-1015)

31. Morgan v. McDonough, 548 F.2d 28 (1st Cir.(Mass.) Jan 26, 1977) (NO. 76-1121, 76-1239, 76-1426)

32. U.S. v. Sanabria, 548 F.2d 1 (1st Cir.(Mass.) Dec 29, 1976) (NO. 76-1016)

33. Vitello v. Gaughan, 544 F.2d 17 (1st Cir.(Mass.) Nov 08, 1976) (NO. 76-1207)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Citations List
Database: ALLFEDS

Search Result Documents:  97

34.  Zannino v. Arnold, 531 F.2d 687 (3rd Cir.(Pa.) Feb 19, 1976) (NO. 75-2101)

35.  Morgan v. Kerrigan, 530 F.2d 401 (1st Cir.(Mass.) Jan 14, 1976) (NO. 75-1184, 75-1194, 75-1197, 75-1212)

36.  Morgan v. Kerrigan, 509 F.2d 618 (1st Cir.(Mass.) Jan 07, 1975) (NO. 75-1001)

37.  McDonough v. Champburger Corp., 488 F.2d 948, Fed. Sec. L. Rep. P 94,384 (5th Cir.(Fla.) Feb 01, 1974) (NO. 73-1719)

38.  U.S. v. Zannino, 468 F.2d 1299 (1st Cir.(Mass.) Nov 07, 1972) (NO. 72-1153)

39.  U.S. v. Goldman, 450 F.2d 873 (1st Cir.(Mass.) Nov 09, 1971) (NO. 71-1042)

40.  U.S. v. Driscoll, 449 F.2d 894 (1st Cir.(Mass.) Oct 12, 1971) (NO. 71-1076)

41.  U.S. v. Miceli, 446 F.2d 256 (1st Cir.(Mass.) Jul 14, 1971) (NO. 71-1080)

42.  In re Reardon, 445 F.2d 798 (1st Cir. Jun 10, 1971) (NO. MISC 477)

43.  U.S. v. Strauss, 443 F.2d 986 (1st Cir.(Mass.) Jun 07, 1971) (NO. 71-1036, 71-1037, 71-1038, 71-1039)

44.  Hurd v. Dimento and Sullivan, 440 F.2d 1322 (1st Cir.(Mass.) Apr 14, 1971) (NO. 7779)

45.  U. S. v. O'Connor, 433 F.2d 752, 26 A.F.T.R.2d 70-5676, 70-2 USTC  P 9649 (1st Cir.(Mass.) Oct 16, 1970) (NO. 7629)

46.  U.S. v. Cotter, 425 F.2d 450, 25 A.F.T.R.2d 70-1239, 70-1 USTC  P 9371 (1st Cir.(Mass.) May 01, 1970) (NO. 7484)

47.  Patriarca v. U.S., 402 F.2d 314 (1st Cir.(Mass.) Oct 14, 1968) (NO. 7126, 7127, 7128)

48.  Sagansky v. U.S., 358 F.2d 195 (1st Cir.(Mass.) Mar 25, 1966) (NO. 6608, 6609)

49.  Flaherty v. U.S., 355 F.2d 924 (1st Cir.(Mass.) Jan 31, 1966) (NO. 6574)

50.  Driscoll v. U.S., 356 F.2d 324 (1st Cir.(Mass.) Jan 31, 1966) (NO. 6494-6499)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Citations List
Database: ALLFEDS

51. La Placa v. U.S., 354 F.2d 56 (1st Cir.(Mass.) Dec 15, 1965) (NO. 6567)

52. Angiulo v. Mullins, 338 F.2d 820, 14 A.F.T.R.2d 6014, 64-2 USTC P 9885 (1st Cir.(Mass.) Dec 03, 1964) (NO. 6334)

53. Grillo v. U.S., 336 F.2d 211, 14 A.F.T.R.2d 5653, 64-2 USTC P 9845 (1st Cir.(Mass.) Sep 17, 1964)
    (NO. 6256, 6262, 6264)

54. Gorin v. U.S., 313 F.2d 641, 11 A.F.T.R.2d 1044, 63-1 USTC P 9295 (1st Cir.(Mass.) Feb 20, 1963)
    (NO. 5997, 5998, 5999)

55. Interbartolo v. U.S., 303 F.2d 34, 9 A.F.T.R.2d 2061, 62-1 USTC P 15,412 (1st Cir.(Mass.) May 22, 1962) (NO. 5919)

56. Killilea v. U.S., 287 F.2d 212 (1st Cir.(Mass.) Feb 23, 1961) (NO. 5610, 5611, 5614, 5615)

57. U.S. v. Gargill, 218 F.2d 556, 55-1 USTC P 9164, 46 A.F.T.R. 1519 (1st Cir.(Mass.) Jan 18, 1955) (NO. 4874)

58. Batista v. Nicolls, 213 F.2d 20 (1st Cir.(Mass.) May 19, 1954) (NO. 4809)

59. Smith v. U.S., 210 F.2d 496, 54-1 USTC P 9259, 45 A.F.T.R. 343 (1st Cir.(Mass.) Feb 26, 1954) (NO. 4792)

60. Settipane v. U.S., 352 F.Supp.2d 27 (D.Mass. Dec 07, 2004) (NO. CIV.A. 04-10188-REK)

61. Callahan v. U.S., 337 F.Supp.2d 348 (D.Mass. Sep 28, 2004) (NO. CIV.A.02-123720RCL)

62. S.E.C. v. Peretz, 317 F.Supp.2d 58 (D.Mass. Apr 13, 2004) (NO. CIV.A.00-11981-PBS)

63. U.S. v. Shore, 143 F.Supp.2d 74, 87 A.F.T.R.2d 2001-1887 (D.Mass. Apr 11, 2001) (NO. 00-CR-10196)

64. U.S. v. Salemme, 91 F.Supp.2d 141 (D.Mass. Sep 15, 1999) (NO. 94-10287-MLW, 97-10009-MLW)

65. S.E.C. v. Pinez, 52 F.Supp.2d 205 (D.Mass. May 25, 1999) (NO. CIV.A. 97-10353-PBS)

66. U.S. v. Buchanan, 987 F.Supp. 56 (D.Mass. Dec 18, 1997) (NO. CRIM. 95-10188-NG)

67. S.E.C. v. Pinez, 989 F.Supp. 325, Fed. Sec. L. Rep. P 90,151, 35 UCC Rep.Serv.2d 971 (D.Mass. Dec 16, 1997)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Citations List
Database: ALLFEDS

(NO. CIV.A. 97-10353-PBS)

68. U.S. v. Buchanan, 964 F.Supp. 533, 47 Fed. R. Evid. Serv. 380 (D.Mass. Mar 31, 1997) (NO. 95CR-10188-NG)

69. U.S. v. Buchanan, 930 F.Supp. 657 (D.Mass. Jun 04, 1996) (NO. CRIM. 95-10188-NG)

70. Vitello v. Gaughan, 414 F.Supp. 26 (D.Mass. Apr 09, 1976) (NO. CIV. 75-3077-F)

71. U.S. v. Interbartolo, 192 F.Supp. 587, 7 A.F.T.R.2d 1880, 61-1 USTC P 15,336 (D.Mass. Mar 07, 1961) (NO. CRIM. 60-50-J, CRIM. 60-53-J)

72. In re C.R. Amusements, LLC, 259 B.R. 523, 45 Collier Bankr.Cas.2d 1423 (Bankr.D.R.I. Feb 20, 2001) (NO. 99-10154, 99-1076)

73. Sullivan v. Tracey, 76 B.R. 876 (Bankr.D.Mass. Sep 02, 1987) (NO. A86-1480-JNG, 86-1480)

74. In re Friday Afternoon, Inc., 73 B.R. 940 (Bankr.D.Mass. May 27, 1987) (NO. 86-10838-JNG, 86-1453)

75. In re Great Barrington Fair and Amusement, Inc., 53 B.R. 237 (Bankr.D.Mass. Aug 19, 1985) (NO. 4-83-00496-G)

76. In re Great Barrington Fair and Amusement, Inc., 53 B.R. 241 (Bankr.D.Mass. Aug 19, 1985) (NO. 4-83-00496-G)

77. London v. C.I.R., Not Reported in N.R.S., T.C. Memo. 1998-346, 1998 WL 667877, 76 T.C.M. (CCH) 539, T.C.M. (RIA) 98,346, 1998 RIA TC Memo 98,346(U.S.Tax Ct. Sep 29, 1998) (NO. 24601-93, 18987-94)

78. Spagnuolo v. C.I.R., T.C. Memo. 1985-528, 1985 WL 15150, 50 T.C.M. (CCH) 1281, T.C.M. (P-H) P 85,528, 1985 PH TC Memo 85,528 (U.S.Tax Ct. Oct 09, 1985) (NO. 6754-82, 9234-82)

79. Kaplan v. C. I. R., T.C. Memo. 1974-29, 1974 WL 2089, 33 T.C.M. (CCH) 131, T.C.M. (P-H) P 74,029, 1974 PH TC Memo 74,029 (U.S.Tax Ct. Jan 31, 1974) (NO. 8203-71)

80. Winslow v. C.I.R., T.C. Memo. 1964-318, 1964 WL 1111, 23 T.C.M. (CCH) 1978, T.C.M. (P-H) P 64,318, 1964 PH TC Memo 64,318 (Tax Ct. Dec 15, 1964) (NO. 191-63)

81. U.S. v. Hurley, 728 F.Supp. 66, 29 Fed. R. Evid. Serv. 359 (D.Mass. Jan 04, 1990) (NO. CR. 89-0068-H)

82. U.S. v. Cincotti, 678 F.Supp. 346 (D.Mass. Jul 31, 1987) (NO. CR 84-293-K)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Citations List
Database: ALLFEDS

83. U.S. v. Nakhoul, 596 F.Supp. 1398 (D.Mass. Oct 31, 1984) (NO. CRIM. 84-217-C)

84. Anselmo v. James, 449 F.Supp. 922, 42 A.F.T.R.2d 78-6105, 78-2 USTC  P 9696 (D.Mass. Apr 24, 1978)
   (NO. CIV. 78-400-F)

85. Morgan v. Hennigan, 379 F.Supp. 410 (D.Mass. Jun 21, 1974) (NO. CIV. 72-911-G)

86. Duplan Corp. v. Deering Milliken, Inc., 397 F.Supp. 1146, 184 U.S.P.Q. 775 (D.S.C. May 30, 1974)
   (NO. CIV. A. 71-306, CIV. A. 70-968, CIV. A. 69-1096, CIV. A. 68-705, CIV. A. 69-777, CIV. A. 70-14, CIV. A. 70-189,
   CIV. A. 70-250, CIV. A. 70-295)

87. Schmitt v. Jacobson, 272 F.Supp. 301 (D.Mass. Sep 13, 1967) (NO. CIV. 62-945)

88. Mullins v. Angiulo, 227 F.Supp. 524, 13 A.F.T.R.2d 1211, 64-1 USTC  P 9400 (D.Mass. Mar 27, 1964) (NO. 63-128)

89. U. S. v. Dubin, 217 F.Supp. 206 (D.Mass. May 03, 1963) (NO. CRIM. 62-233)

90. U.S. v. De Vincentis, 30 F.R.D. 71, 9 A.F.T.R.2d 1104, 62-1 USTC  P 9315 (D.Mass. Mar 01, 1962) (NO. CR, 61-287)

91. U.S. v. Pellegrini, 201 F.Supp. 65 (D.Mass. Jan 25, 1962) (NO. CRIM. 61-196)

92. U.S. v. Pellegrini, 198 F.Supp. 440 (D.Mass. Oct 11, 1961) (NO. CRIM. 61-196)

93. U.S. v. One 1959 Chrysler Four-Door Sedan Saratoga, 196 F.Supp. 32, 61-2 USTC  P 15,354 (D.Mass. Jul 12, 1961)
   (NO. CIV. 60-27-J)

94. Maloney v. Stone, 171 F.Supp. 29, 121 U.S.P.Q. 257 (D.Mass. Jan 16, 1959) (NO. CIV. 57-781)

95. U.S. v. Two Hollycrane Slot Machines, 136 F.Supp. 550 (D.Mass. Dec 21, 1955)
   (NO. MISC. CIV. 51-69, 1648-30, 1650-30)

96. U.S. v. Bruce Mach. Co., 132 F.Supp. 525, 55-1 USTC  P 9383, 47 A.F.T.R. 1698 (D.Mass. Jun 24, 1955)
   (NO. CIV. 54-256)

97. U.S. v. Levine, 127 F.Supp. 651, 55-1 USTC  P 9321, 47 A.F.T.R. 987 (D.Mass. Jan 26, 1955)
   (NO. CRIM. 54-285, CRIM. 54-286)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Search Products [      ] [GO]  🛒 Items in cart:0

| HOME | PRODUCTS & SERVICES | WESTLAW INFORMATION | MY ACCOUNT | CUSTOMER SUPPORT |

Home  Products & Services  Product Information

**Browse Products by...**

» Topic
» Jurisdiction
» Product Type
» What's New

**Find a Specific...**

» Title
» Author

**Popular Destinations**

» Current Promotions
» Free Newsletters
» Filing Instructions
» User Guides
» Software Downloads
» Careers at West
» Find your Rep
» Westlaw® Sign-On
» Privacy

## Kenneth J. Fishman

A partner in the law firms of Bailey,

Fishman & Leonard in Boston Massachusetts, and Bailey, Fishman,

Freeman & Ferrin in West Palm Beach, Florida. Mr. Fishman

received his B.S. in Ecomonics from University of Pennsylvania,

Wharton School in Philadelphia, and his J.D. (Cum Laude) from

Suffolk University Law School in Boston. He is a member of the

bars of Massachusetts, United States Supreme Court, United States

Tax Court, United States District Courts of California, Massachusetts

and Wisconsin, and nine United States Courts of Appeal.

Mr. Fishman is co-author of *Criminal Trial Techniques*,

*Complete Manual of Criminal Forms 3d, Handling Misdemeanor*

*Cases 2d* and supplements *Handling Narcotic & Drug Cases*,

*Crimes of Violence-Homicide & Assault, Crimes of*

*Violence-Rape & Other Sex Crimes*, and *Defending Business*

*& White Collar Crimes 2d* with F. Lee Bailey.

Titles by thi

Questions? Call 1-800-344-5008 or click Live Web Help.

Site Map | Contact Us | Accessibility | Privacy | © 2005 West
Thomson | Thomson - Legal

**ATTENTION AUTHORS AND JOURNALISTS:**
IMPORTANT INFORMATION ABOUT THE SETTLEMENT
OF THE IN RE LITERARY WORKS IN ELECTRONIC DATABASES COPYRIGHT LITIGATION

Citations List
Database: ALLFEDS

1. U.S. v. Moran, 312 F.3d 480 (1st Cir.(Mass.) Sep 23, 2002) (NO. 00-2097)

2. Rivero-Cabanas v. U.S., 46 Fed.Appx. 2,
   2002 WL 31008514 (1st Cir.(Puerto Rico)) (Not selected for publication in the Federal Reporter)
   (1st Cir.(Puerto Rico) Sep 09, 2002) (NO. 01-1126, 01-1215)

3. Fishman v. LaSalle Nat. Bank, 247 F.3d 300 (1st Cir.(Mass.) Apr 26, 2001) (NO. 00-2032)

4. Fishman v. LaSalle Nat. Bank, 6 Fed.Appx. 52,
   2001 WL 427295 (1st Cir.(Mass.)) (Not selected for publication in the Federal Reporter) (1st Cir.(Mass.) Apr 26, 2001)
   (NO. 00-2032)

5. U.S. v. Flemmi, 245 F.3d 24 (1st Cir.(Mass.) Mar 30, 2001) (NO. 00-1968)

6. U.S. v. Flemmi, 225 F.3d 78 (1st Cir.(Mass.) Sep 11, 2000) (NO. 99-2292)

7. Wong v. Money, 142 F.3d 313, 1998 Fed.App. 0114P (6th Cir.(Ohio) Apr 16, 1998) (NO. 96-4155)

8. U.S. v. Lussier, 64 F.3d 34 Withdrawn for N.R.S. bound volume (2nd Cir.(Vt.) Aug 18, 1995) (NO. 1377, 94-1377)

9. U.S. v. Lussier, 71 F.3d 456 (2nd Cir.(Vt.) Aug 18, 1995) (NO. 94-1377)

10. U.S. v. Melvin, 27 F.3d 710 (1st Cir.(Mass.) Jun 22, 1994) (NO. 92-1563, 92-1564, 92-1565, 92-1566, 92-1724)

11. U.S. v. Melvin, 27 F.3d 703, 39 Fed. R. Evid. Serv. 647 (1st Cir.(Mass.) Apr 22, 1994)
    (NO. 92-1563, 92-1564, 92-1565, 92-1566, 92-1567, 92-1642, 92-1643, 92-1644, 92-1645)

12. U.S. v. Cassiere, 4 F.3d 1006, 39 Fed. R. Evid. Serv. 539 (1st Cir.(Mass.) Sep 16, 1993) (NO. 92-2073, 92-2074, 92-2182)

13. Biscayne Oil & Gas, Inc. v. Burdette Oil & Gas Co., Inc., 947 F.2d 940 (Table, Text in WESTLAW), Unpublished
    Disposition, 1991 WL 224261 (4th Cir.(W.Va.) Nov 05, 1991) (NO. 90-2467)

14. Bushkin Associates, Inc. v. Raytheon Co., 906 F.2d 11 (1st Cir.(Mass.) Jun 08, 1990) (NO. 89-2093)

15. U.S. v. Crooks, 766 F.2d 7, 18 Fed. R. Evid. Serv. 637 (1st Cir.(N.H.) Jun 26, 1985) (NO. 84-1510)

16. U.S. v. Massa, 740 F.2d 629, 16 Fed. R. Evid. Serv. 339 (8th Cir.(Mo.) Aug 06, 1984) (NO. 83-1756, 83-1803)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Citations List
Database: ALLFEDS

Search Result Documents: 57

17. U.S. v. Bailey, 707 F.2d 19, 52 A.F.T.R.2d 83-5127, 83-1 USTC  P 9372, 12 Fed. R. Evid. Serv. 2027
(1st Cir.(Mass.) May 23, 1983) (NO. 82-1400)

18. Brien v. U.S., 695 F.2d 10 (1st Cir.(Mass.) Dec 08, 1982) (NO. 82-1387)

19. Eagle-Picher Industries, Inc. v. Liberty Mut. Ins. Co., 682 F.2d 12 (1st Cir.(Mass.) Jun 30, 1982)
(NO. 81-1761, 81-1762, 81-1763)

20. U.S. v. Alessandrello, 637 F.2d 131, 7 Fed. R. Evid. Serv. 477 (3rd Cir.(N.J.) Nov 21, 1980) (NO. 79-2654, 79-2699)

21. Jenkins v. Harvey, 634 F.2d 130 (4th Cir.(S.C.) Oct 23, 1980) (NO. 80-6014)

22. U.S. v. Gross, 614 F.2d 365 (3rd Cir.(N.J.) Feb 07, 1980) (NO. 79-2010)

23. U.S. v. Abrahams, 604 F.2d 386 (5th Cir.(Tex.) Oct 12, 1979) (NO. 78-5687)

24. Santana v. U.S., Slip Copy, 2005 WL 1397413(D.Puerto Rico Jun 08, 2005) (NO. CIV 04-1941CCC)

25. Samper v. Greiner, Slip Copy, 2005 WL 1140541(S.D.N.Y. May 16, 2005) (NO. 00 CIV.1401(AKH))

26. U.S. v. Lubell, 301 F.Supp.2d 88 (D.Mass. Feb 06, 2004) (NO. CR. 01-10122-EFH)

27. Bamberg v. KPMG, LLP, 219 F.R.D. 33 (D.Mass. Dec 15, 2003) (NO. CIV.A.02-10304-PBS)

28. Bamberg v. SG Cowen, 236 F.Supp.2d 79 (D.Mass. Dec 09, 2002) (NO. CIV.A.02-CV-10304-PB, CIV.A.02-CV-10367-PB)

29. In re Lernout & Hauspie Securities Litigation, 230 F.Supp.2d 152, Fed. Sec. L. Rep. P 92,029, Fed. Sec. L. Rep. P 92,222
(D.Mass. Aug 19, 2002)
(NO. CIV.A.00-CV-11589-PB, CIV.A.02-CV-10304-PB, CIV.A.02-CV-10302-PB, CIV.A.02-CV-10303-PB)

30. U.S. v. Carucci, 222 F.Supp.2d 117 (D.Mass. Aug 15, 2002) (NO. CRIM.97-10060-REK)

31. U.S. v. Flemmi, 195 F.Supp.2d 243 (D.Mass. Aug 30, 2001) (NO. CR 94-10287-MLW)

32. U.S. v. Farrah, 128 F.Supp.2d 103 (D.Conn. Jan 16, 2001) (NO. CRIM. 3:98CR146 AWT)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Citations List
Database: ALLFEDS

33.  U.S. v. Flemmi, 233 F.Supp.2d 113 (D.Mass. Nov 14, 2000) (NO. CR. 94-10287-MLW)

34.  U.S. v. Flemmi, 108 F.Supp.2d 39 (D.Mass. Jul 05, 2000) (NO. 94-10287-MLW)

35.  U.S. v. Flemmi, 233 F.Supp.2d 75 (D.Mass. Feb 24, 2000) (NO. 94-10287 MLW)

36.  U.S. v. Salemme, 91 F.Supp.2d 141 (D.Mass. Sep 15, 1999) (NO. 94-10287-MLW, 97-10009-MLW)

37.  U.S. v. Salemme, 164 F.Supp.2d 49 (D.Mass. Feb 13, 1998) (NO. CR. 94-10287, CR. 97-10009)

38.  U.S. v. Salemme, Not Reported in F.Supp., 1997 WL 810057(D.Mass. Dec 29, 1997)
     (NO. 94-10287-MLW, 97-10009-MLW)

39.  U.S. v. Salemme, 985 F.Supp. 197 (D.Mass. Nov 05, 1997) (NO. CR. 94-10287, CR. 97-10009)

40.  U.S. v. Lloyd, 983 F.Supp. 738 (N.D.Ill. Oct 22, 1997) (NO. 97 C 2799, 89 CR 427, 97 C 3140, 97 C 3137, 97 C 3020)

41.  U.S. v. Salemme, 985 F.Supp. 193 (D.Mass. Sep 10, 1997) (NO. CR. 94-10287, CR. 97-10009)

42.  U.S. v. Salemme, 978 F.Supp. 390 (D.Mass. Jun 27, 1997) (NO. 94-10287, 97-10009)

43.  U.S. v. Salemme, 978 F.Supp. 386 (D.Mass. Jun 26, 1997) (NO. 94-10287)

44.  U.S. v. Salemme, 978 F.Supp. 379 (D.Mass. Jun 19, 1997) (NO. 94-10287-MLW)

45.  U.S. v. Salemme, 978 F.Supp. 375 (D.Mass. Jun 13, 1997) (NO. 94-10287-MLW)

46.  U.S. v. Salemme, 978 F.Supp. 364 (D.Mass. Jun 06, 1997) (NO. 94-10287-MLW)

47.  U.S. v. Salemme, 978 F.Supp. 343 (D.Mass. Jun 28, 1997) (NO. 94-10287, 97-10009)

48.  U.S. v. Palmisano, 185 B.R. 476 (D.Vt. Aug 23, 1995) (NO. 94-CR-49)

49.  U.S. v. Palmisano, 895 F.Supp. 67 (D.Vt. Aug 16, 1995) (NO. 94-CR-49)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Citations List
Database: ALLFEDS

50. Gross v. Bohn, 782 F.Supp. 173 (D.Mass. Dec 17, 1991) (NO. CIV.A. 90-11901-N)

51. Karbon v. Turner, Not Reported in F.Supp., 1991 WL 319976(E.D.Wis. Dec 16, 1991) (NO. 91-C-337)

52. U.S. v. Habicht, 766 F.Supp. 22 (D.Mass. Jun 03, 1991) (NO. CR.A. 91-10039-MA)

53. Barrett v. U.S., Not Reported in F.Supp., 1991 WL 60365(S.D.N.Y. Apr 10, 1991)
    (NO. 76 CIV. 381 (CBM), 76 CIV. 1061 (CBM))

54. Bailey v. U.S., 40 Fed.Cl. 449 (Fed.Cl. Feb 10, 1998) (NO. 96-666C)

55. Cooke v. Orser, 12 M.J. 335 (CMA Feb 22, 1982) (NO. MISC. 81-59)

56. Bushkin Associates, Inc. v. Raytheon Co., 717 F.Supp. 18 (D.Mass. Jul 19, 1989) (NO. CIV.A. 81-1101-H)

57. Murray v. Bailey, 613 F.Supp. 1276, 11 Media L. Rep. 1369 (N.D.Cal. Jan 04, 1985) (NO. C-83-5591 WHO)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.